**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JOHN M.,** a Minor, and | ) | FILED: AUGUST 12, 2008 |
| **LISA M.,** Individually and | ) | 08CV4576 |
| as Parent and Next Friend of **JOHN M.,** | ) | JUDGE NORDBERG |
| | ) | MAGISTRATE JUDGE DENLOW |
| Plaintiffs, | ) | JFB |
| | ) | |
| v. | ) | |
| | ) | |
| **BOARD OF EDUCATION OF THE** | ) | |
| **CITY OF CHICAGO, DISTRICT 299** | ) | |
| | ) | |
| Defendant | ) | |

## COMPLAINT

NOW COME JOHN M., a minor, and LISA M., in her own capacity and as parent and next friend of JOHN M. by and through their attorney, Michael A O'Connor, and as their complaint, state as follows:

## PRELIMINARY STATEMENT

1.  This is an action pursuant to 20 U.S.C. Sec. 1415(i)(3) for attorney's fees and costs incurred by Plaintiffs, JOHN M., and LISA M.; after requesting due process hearing and prevailing in claims against Defendant BOARD OF EDUCATION OF THE CITY OF CHICAGO, DISTRICT 299. Plaintiffs are entitled to payment of reasonable attorney fees, which the defendant has failed to pay.

1

## JURISDICTION

2.   This Court has jurisdiction over this matter pursuant to 20 U.S.C. Sec. 1415(i)(3) and 105 ILCS Sec. 5/14-8.02. Venue is properly located in this District.

## PARTIES

3.   JOHN M. is an 11 year-old boy who will enter 6th grade in the 2008-9 school year. His school district of residence is Chicago Public School District No. 299 (hereafter CPS). Following a five day due process hearing, JOHN M. and his parent, LISA M. prevailed in that an Independent Hearing Officer issued an order which determined that CPS had denied JOHN M. a free and appropriate public education for more than two years. The Hearing Officer ordered that CPS provide additional services and supports including 30 hours of direct instruction during the summer of 2008 and again during the summer of 2009.    JOHN M. brings this action by and through her parent and next friend, LISA M.,

4.   LISA M., also brings this action on her own behalf as the prevailing party in the administrative process.  She is JOHN M.'s mother, and she resides with JOHN in Chicago, Illinois and within the boundaries of Chicago Public School District No. 299.

5.   Defendant BOARD OF EDUCATION OF THE CITY OF CHICAGO, DISTRICT 299 (Hereafter the Board, or CPS) is the Local Education Agency as defined in 20 U.S.C Sec. 1402(15) and, as such, is responsible for ensuring the provision of a free and appropriate education to all children residing in the district who, because of their disabilities, have special education needs.  On information and belief, the Board has been periodically apprised of and has made decisions concerning this matter.

**FACTUAL ALLEGATIONS**

6.   JOHN M. (hereafter John) was determined eligible for special education services based on a determination that he had a mild cognitive impairment, and he attended second grade and most of third grade (2005-6 and 2006-7 school years) in a self-contained classroom, which is a small classroom exclusively for students with disabilities.

7.   At the beginning of the 2005-6 school year John was transferred from his home school, Wacker Elementary, to Evers Elementary school, because Wacker School did not have a self-contained classroom.

8.   John received a triennial evaluation in April, 2006, at which time a CPS psychologist determined that John had cognitive skills in the "low average range" with individual subtest scores ranging from low average to average. These scores caused the psychologist to conclude that John was not cognitively impaired.  As a result of this determination, his eligibility was changed to learning disabled.

9.   An IEP developed in April, 2006 following the triennial evaluation moved John from a self-contained classroom a regular education classroom for most of his school day. His IEP provided for 400 minute per week, or about 1 hour and 20 minutes per day in a "resource room" with a special education teacher.  At the end of the 2006-7 school year CPS transferred John back to his home school at Wacker.

10. John's mother, Plaintiff LISA M. (hereafter Lisa M.) disagreed with the IEP team decision to shift her son out of a self contained classroom in into the regular education classroom.

11. Plaintiff Lisa M. also expressed concerns that John was not making reasonable progress in the regular education classroom. She repeated those concerns at IEP meetings in 2006, 2007 and in 2008.

12. Plaintiff Lisa M. enrolled her son in a summer and afterschool tutoring program at the Star Learning Center, at St. Xavier University during the summer and Fall of 2007.  Instruction at the Star Learning center, increased John's reading comprehension from first to second grade level.  During the Fall of 2007, John was in 5th grade at Wacker Elementary School.

13. LISA M. retained Mauk & O'Connor, LLP and Michael A. O'Connor to represent them, and on their behalf he requested a due process hearing on November 1, 2007 to redress violations of the Individuals with Disability Act (IDEA) 20 U.S.C. ¶1401 *et seq*.

14. The due process hearing request alleged that CPS did not provide a free and appropriate education during the period from November 1, 2005 based on:

1) Failure to conduct adequate or timely assessments of all areas of potential disabilities including, speech and language, occupational therapy, learning disabilities and social/emotional (untimely only)with the result that the student's educational program for this period did not address, or addressed inadequately, his learning impediments and attentional difficulties;

2) Failure to provide essential related services, with adequate levels of intensity, in areas of speech language, occupational therapy, assistive technology and social work services;

3) Failure to identify and utilize effective teaching methodologies at a sufficiently intensive level that would enable the student to make progress commensurate with his  cognitive skills;

4) Failure to offer a complete curricula in areas of reading, language arts, math, social studies and science, with the result that student did not make academic progress;

5) The parent contends that the student's IEP's for the past two years:
   i) Included statements of present levels of performance that do not accurately and objectively state the student's skills and functional levels.
   ii) Provide goal statements that are vague and not measurable, and where the goals set an increase in skill level, the goal is not commensurate with the student's potential for development.
   iii) Fail to address attentional and organizational limitations of the student;
   iv) Fail to identify what methodology will be used to remediate student's reading and math skills;
   v) provide for an inadequate level of related services in
      (a) Speech language services are authorized at 30 minutes per week, but should be at least 60 minutes per week for a child with significantly depressed expressive and receptive language skills;
      (b) Failed to offer social work services prior to January, 2008, despite evidence of poor social interaction by the student;
      (c) Failure to implement assistive technology resources in accordance with recommendations in AT report;
   vi) Offer occupational therapy only on a consultative basis, despite evidence that direct OT services are required;
      a. Fail to authorize extended school year services, despite substantial evidence that the student has experienced total lack of educational progress over the past two years.

15. Plaintiffs sought the following relief in the due process hearing:

   1. Private therapeutic day school placement at public expense;
   2. Direct that CPS pay for independent educational evaluations in areas of identified need, including occupational therapy, social/emotional, speech/language, and assistive technology;
   3. direct CPS to offer related services in sufficient intensity to allow student access to educational opportunity;
   4. direct CPS to provide compensatory education services for loss of FAPE during the past two years, including; after school tutoring by a certified special education teacher for one hour per week for two years;
   5. direct CPS to convene an IEP meeting that will consider results of evaluations and implement the foregoing relief; and
   6. Other relief that will be determined after the receipt of additional school records.

16. A due process hearing ensued, beginning on February 25, 2008, and continuing on

February 26, March 5, March 11 and April 28, 2008, before an independent hearing officer

(IHO) appointed by the Illinois State Board of Education.   Following completion of the hearing the IHO issued a decision and order on May 12, 2008 (a copy of the decision is attached hereto as Exhibit A).

17. The IHO found that CPS denied John a free and appropriate public education from June 20, 2005, based on procedural violations (p 19 of decision), failure to provide speech/language services and assistive technology with sufficient intensity (p. 23 of decision); failure to offer reading instruction with sufficient intensity (p 25 of decision), failure to offer Extended School Year services (summer school) (p. 27 of the decision), and inadequacies in the Individual Education Program (IEP) prepared in March, 2007 for the 2007-8 school year (p. 27 of decision).

18. The IHO ordered:

> 1.  The Parent's request that the Student be allowed to attend a private therapeutic day school at public expense is denied.
>
> 2.  The Parent's request that CPS pay for independent educational evaluations that were completed in the areas of occupational therapy, social/emotional, speech and language and assistive technology is denied.
>
> 3.  The Parent's request that CPS be directed to pay for additional independent evaluations in areas of demonstrated need such as OT, is denied.
>
> 4.  Parent's request that CPS be directed to provide related services with sufficient intensity is granted with respect to speech and language and assistive technology. The District is ordered to provide J. with at least one hour per week of speech and language therapy extending, at least, through the 2008-09 school year.  The District is also ordered to provide J. with appropriate assistive technology support. This requires more than insuring AT products are available in the resource room. CPS must provide both the resource room teacher and the Student with adequate training to be able to use the AT products.  Most important, the Student must receive weekly instruction -- with direct teacher supervision --using one or more of the AT products for written expression. (Co:Writer and Write:Outloud) Instructional time for written expression must be at least forty minutes per week. To the extent it has not already happened, J. should begin to use the written expression software to assist him in completing written assignments from his regular classroom assignments.

5.  Parent's request that CPS be directed to provide the Student with compensatory services is granted in the following ways:

- CPS shall provide the Student with after school tutoring by a certified special education teacher for one hour per week for the 2008-09 school year;

- CPS shall provide the Student with reading instruction in the summer of 2008 and 2009.  Because it has proved to be more successful with J. than other multisensory methods, the instruction must rely on the Wilson method.  Moreover, instruction must be provided by a teacher who has received Wilson training, and who has taught the Wilson method to students. The summer sessions must extend for at least five weeks, with at least three sessions per week lasting two or more hours.

6.  The Parties shall convene an IEP conference no later than two weeks from the date of this decision to draft a new IEP for J., which takes this decision and order into account.  In particular, the IEP must provide sufficient time for J. to receive at least one hour a day, at least four days a week, of reading instruction using the Wilson reading method.

[in footnote to para 6] To ensure J.'s progress, the instructor should closely follow the Wilson manual of instructions, and avoid combining elements of numerous methods.  This will more effectively provide the consistency, repetition and reinforcement that is critical to J.'s success

7.  Assuming Ms. Smith will be the individual who provides Wilson instruction to the Student, CPS shall provide Ms. Smith with additional training in the Wilson method, either through additional support from Ms. Condron, or by providing for Ms. Smith to attend at least one additional Wilson seminar at CPS' expense.(pp 27-29 of decision).

19. On June 11, 2008, John, and her parent, Lisa M., through their attorney, submitted an interim claim for attorney fees to Defendant Board (attached hereto as exhibit B).  The total amount claimed for representation in the due process hearing through that date is $52,814.02.

20. Plaintiffs offered to accept a reduction in fees, to eliminate billing for an IEP meeting and related activities, but Defendant declined to accept the offer.

21. Plaintiffs have incurred, and will incur, additional attorney fees for action to ensure compliance with the IHO decision.

22. Defendants have failed to pay Plaintiffs the amount fees reasonably incurred in the due process proceeding.

## LEGAL ALLEGATIONS

23.     Plaintiffs' are the prevailing parties in the administrative proceeding against CPS pursuant to 20 U.S.C. Sec. 1415(i)(3)(B).

24. Plaintiffs are entitled to reasonable attorney's fees and costs as the prevailing party pursuant to 20 U.S.C. Sec. 1415(i)(3)(B).

25. Plaintiffs' attorney's hourly rates are consistent with the rates prevailing for the kind of quality of services furnished, as required by 20 U.S.C. Sec. 1415(i)(3)(B).

26. The time expended and billed by Plaintiffs' counsel in the due process hearing is reasonable, consistent with the overall results obtained, and therefore are compensable under 20 U.S.C. Sec. 1415(i)(3)(B).

27. There are no special circumstances which would render the award of Plaintiffs' full request unjust, nor are the fees requested excessive.


## RELIEF

WHEREFORE,

LISA M., on her own behalf and as parent and next friend of JOHN M. pray that this Court:

a.   find that Plaintiffs were the prevailing party in their administrative proceeding against Defendants pursuant to 20 U.S.C. Sec. 1415(i)(3)(B);

b.  Award attorney fees and costs in the amount of $49,489.02 for fees

and costs incurred in prevailing in the administrative proceeding

against defendants;

c.  Award such additional fees as may reasonably be incurred in

connection with para. 24 above;

d.  Award reasonable attorney fees which are being incurred to prosecute

this Complaint; and

e.  Grant such other relief as this Court deems just.

Respectfully submitted,

S/_____

August 12, 2008                              Michael A O'Connor,
                                             Attorney for Plaintiffs

Michael A O'Connor
MAUK & O'CONNOR, LLP
1427 W. Howard St.
Chicago IL 60626-1426
(773)262-2199
Attorney No. 2088266

## ILLINOIS STATE BOARD OF EDUCATION
## IMPARTIAL DUE PROCESS HEARING

| | | |
|---|---|---|
| J. M. | ) | |
| | ) | |
| Student | ) | |
| vs. | ) | Case No. 2008-0212 |
| | ) | |
| CITY OF CHICAGO SD 299 | ) | |
| | ) | |
| Local School District | ) | |

KRISTINE L. ANDERSON, Hearing Officer

## HEARING DECISION AND ORDER

This matter comes before me pursuant to the Due Process Hearing Request of the Student's mother, Ms. "M.", on behalf of her son, "J." The family is represented by Michael O'Connor of Mauk & O'Connor. The District is represented by Tracy Hamm. I have jurisdiction to hear and decide this matter pursuant to 105 ILCS 5/14-8.02(a) et. seq., and 23 Illinois Administrative Code §§226.600 et. seq.

## PROCEDURAL HISTORY

Ms. M. filed a request for a due process hearing on November 1, 2007. I was appointed as Hearing Officer on November 16, 2007. The parties held a resolution session on December 10, 2007. As a result of the resolution session, the Parties agreed to convene an IEP meeting, which took place on December 20, 2007. Some, but not all of the issues were resolved in the IEP conference. We held a pre-hearing conference on January 23, 2008. The parties convened another IEP conference on February 21, 2008 to consider an independent speech and language and assistive technology evaluation. Though the Student's IEP was once again revised in this meeting, this still did not resolve all issues. The hearing began on February 25, 2008 and continued on February 26, March 5, March 11 and April 28, 2008.[1] The hearing concluded on that day and I rendered my decision on May 12, 2008.

---

[1]The parties had been hopeful that the hearing would be completed in four days. When that was not the case, it became necessary to schedule a 5th day of testimony. April 28 was the first available date that I could reconvene this hearing.

## **Issues**

The Student asserts that CPS did not provide a free and appropriate public education during the period from November 1, 2005 through the present based on:

1) Failure to conduct adequate or timely assessments of all areas of potential disabilities including, speech and language, occupational therapy, learning disabilities and social/emotional (untimely only) with the result that the student's educational program for this period did not address, or addressed inadequately, his learning impediments and attentional difficulties;

2) Failure to provide essential related services, with adequate levels of intensity, in areas of speech language, occupational therapy, assistive technology and social work services;

3) Failure to identify and utilize effective teaching methodologies at a sufficiently intensive level that would enable the student to make progress commensurate with his cognitive skills;

4) Failure to offer a complete curricula in areas of reading, language arts, math, social studies and science, with the result that student did not make academic progress;

5) The parent contends that the student's IEP's for the past two years:
    i) Included statements of present levels of performance that do not accurately and objectively state the student's skills and functional levels.
    ii) Provided goal statements that are vague and not measurable, and where the goals set an increase in skill level, the goal is not commensurate with the student's potential for development.
    iii) Failed to address attentional and organizational limitations of the student;
    iv) Failed to identify what methodology will be used to remediate student's reading and math skills;
    v) provided for an inadequate level of related services in
        (a) Speech language services are authorized at 30 minutes per week, but should be at least 60 minutes per week for a child with significantly depressed expressive and receptive language skills;
        (b) Failed to offer social work services prior to January, 2008, despite evidence of poor social interaction by the student;
        (c) Failure to implement assistive technology resources in accordance with recommendations in AT report;
    vi) Offered occupational therapy only on a consultative basis, despite evidence that direct OT services are required;
    vii) Failed to authorize extended school year services, despite substantial evidence that the student has experienced total lack of educational progress over the past two years.

2

## Relief Requested

The Parent requests the following relief:

1. Private therapeutic day school placement at public expense;
2. Direct that CPS pay for independent educational evaluations in areas of identified need, including occupational therapy, social/emotional, speech/language, and assistive technology;
3. Direct CPS to offer related services in sufficient intensity to allow student access to educational opportunity;
4. Direct CPS to provide compensatory education services for loss of FAPE during the past two years, including; after school tutoring by a certified special education teacher for one hour per week for two years;
5. Direct CPS to convene an IEP meeting that will consider results of evaluations and implement the foregoing relief; and
6. Other relief that will be determined after the receipt of additional school records.

## Findings of Fact

J. is a 10 year old fifth grader who currently attends Wacker Elementary School.  For the period at issue, November 1, 2005 to the present, he has attended two CPS elementary schools, Evers and Wacker.  J. began attending Wacker in September of 2004 in a regular second grade classroom.  Within a short period of time, J.'s mother, Mrs. M., alerted the school that J. was struggling in the regular classroom and that he previously had received special education services.  Around this time, the school received J.'s records from his previous school.  The Wacker IEP team met and determined that J. qualified for services in a self-contained special education classroom as a cognitively impaired student.  Because nearby Evers offered such a placement and Wacker did not, J. was transferred to Evers.

J. remained in the self-contained classroom for all of second grade and most of his third grade year.  ( Montelione Testimony, Tr. 44, 12/07 Social Assessment, SD 22, HX 38)  In April, 2006, the IEP team met to consider the results of a  triennial evaluation and to write a new IEP for J.  Based on the results of the evaluation as well as J.'s classroom performance, the team changed J.'s eligibility determination to learning disabled from mild cognitive impairment.  The team also changed J.'s placement from a self-contained classroom to a regular third grade classroom with resource room support. (*See* 4/6/06 IEP, SD 104, HX 9)  The changes were implemented almost immediately and J. finished the 2005-06 school year attending a regular third grade class at Evers.  He was transferred back to Wacker at the  beginning of his fourth grade year since Wacker offered a resource room and could provide the services specified on J.'s IEP.[2]  J. has

---

[2] The Parent asserts the transfer was in retaliation for her complaints about the change in J.'s placement.  The District denies this assertion.  Other than the coincidental timing, there is no other evidence to support the Parent's charge.

remained at Wacker, and currently attends a regular fifth grade class with resource room support. Testimony concerning J.'s learning needs and the services he received during the period at issue is summarized below.

**The Parent's Testimony**

Ms. M. is a strong advocate for her son. She is committed to obtaining the best education possible for J. To that end, she has been an active member of J's IEP team, participating in most -- if not all -- of the IEP meetings. As she should, she sees herself as an equal member of the IEP team and doesn't hesitate to share her views about J.'s needs. In addition to her efforts in the IEP process, Ms. M. supports the school's efforts by helping J. with his homework and by reinforcing skills that he learns at school. On at least one occasion, she has provided J. with private instruction to bolster what is being done at school (the Star Academy reading program.)

Ms. M. testified that she believes the District has failed to meet J.'s educational needs extending back to his self-contained placement. The record, however, doesn't support her assertion that she was unhappy with the J.'s self-contained placement. Indeed, Ms. M. wanted J. to remain in the self-contained classroom because as she put it, " he was making a lot of progress in that class." (5/17/06 Letter to Montelione, SD 271, HX 18) There is no doubt, though, that she strongly disagreed with the team's decision to place J. in a regular classroom with resource room support. When the team changed J.'s placement to a resource room in April, 2006, Ms. M. wrote a series of letters (discussed in detail below) expressing her concern and disagreement with this placement. (*See, e.g.,* 4/11/06 Letter, SD 274, HX 14)

Ms. M. continues to believe that J.'s needs are not being met in the regular classroom and resource room. She testified that she visited a private therapeutic day school and was impressed with the small classes, available technology and quality of instruction. She would like for her son to be able to attend such a school, because she believes he would greatly benefit from that learning environment.[3]

**J.'s Third Grade Year**

- **The April 22, 2005 IEP**

Ellistene Lewis-Gordon was J.'s teacher for the period that J. attended the self-contained classroom at Evers. (Gordon 2/25/08 Testimony, Tr. 212-13) Ms. Gordon is an experienced teacher who was a very credible witness. She testified about J.'s IEP's and the teaching strategies she used to implement the goals on his IEP. (*Id.*)

The first IEP for J. that is relevant to the period in question was written by Ms. Gordon and the team -- including the Parent -- on April 22, 2005. (*See* 4/22/05 IEP, SD 136, HX 2) According

---

[3] To the extent that I do not provide citations for the testimony of some witnesses, it is because transcripts including their testimony had not become available at the time of this writing.

to this IEP, J.'s disabilities were mild cognitive impairment and speech and language impairment. (*Id.* SD 136) Ms. Gordon testified, and the IEP indicates, that J. received specialized instruction in the academic areas of language arts/reading, math, science and social science. The IEP also includes a goal for independent functioning. (*Id.* at SD 141-46). In addition, J. received speech and language therapy for thirty minutes per week. (*Id.* at 146)

The instructional goals and benchmarks in this IEP are well written and thorough. They include J.'s present level of functioning in reading and math.[4] The science and social science goals indicate that J. will be given materials consistent with his reading instructional level. The annual goals and quarterly benchmarks are specific and measurable. Unfortunately, the IEP does not indicate whether J. met each of the quarterly benchmarks. Ms. Gordon testified, however, that J. successfully met each of the benchmarks for all the areas in which she had teaching responsibility. (Gordon 2/26/08 Tr. 58-67) The benchmarks require J. to succeed at a level of 60 percent accuracy, and Ms. Gordon was asked why the requirements weren't more rigorous. She replied that she wanted to ensure that J. was successful. ( 2/26/08 Tr. 59) As J. succeeded in these tasks, she increased the accuracy requirements to 70 percent accuracy. This is demonstrated in J.'s subsequent IEP  written on April 6, 2006. (*See* 4/6/06 IEP, SD 91, HX 9 )

In addition to instructional goals and objectives, the IEP specifies a number of modifications that are to be implemented on J.'s behalf including, extended time on task, work at functioning grade level, regular review, monitoring on-task behavior in ten minute intervals, and giving positive praise and incentives. (*Id.* at SD 139)

The IEP specifically indicates that assisstive technology is needed for J. to access the curriculum. ( HX 2 at 139) It is silent, however, on the types of AT that should be used, or how the products be implemented. This is despite the fact that CPS had conducted an assistive technology assessment just a few months earlier, and the evaluator had issued a report with specific recommendations. (12/17/04 Assistive Technology Report, SD 156, HX 3)  In particular, the evaluator recommended that J. make use of software already present in the classroom including, Co:Writer and Write:Outloud to help J. with writing assignments. She also recommended Kurzweil on a temporary basis until J.'s reading improved with reading instruction. (*Id.* at 157) Significantly, the AT evaluator also recommended that J. be referred to an occupational therapist, but the 4/22/05 IEP does not provide J. with occupational therapy. (*See* HX 2)

Finally, the IEP indicates that Ms. M. shared her concerns about J.'s reading skills and requested that J. be given more computer time to reinforce his reading. (HX 2 at SD 137)  Though it is not reflected in the IEP, Ms. Gordon testified that she responded to Mrs. M's request by giving J. more computer  time when possible. (2/26/08 Tr. 56)  Ms. M. signed the IEP but indicated her signature was intended only to show that she participated in the meeting.[5] (*Id.* at SD 136)  She did not, however, specify any disagreement with the IEP or submit a dissent.

---

[4] The IEP includes the following Kaufman Test of Educational Achievement grade level scores:  reading 1.2, spelling 1.8, math 2.1

[5] This was her practice throughout the period in dispute.

- **Implementing J.'s IEP**

Ms. Gordon also testified about the steps she took to implement J.'s IEP and his performance in her class.   According to Gordon, J.'s greatest area of need was reading.  This was reflected in his IEP which allocated over two hours each day to reading instruction.[6] The IEP targeted decoding skills, fluency and understanding.  (HX 2 at 141)  To address these deficits, Gordon incorporated a number of multisensory methods into her instruction.   In particular, Gordon used phonetic sequencing from the Lindamood Bell method  for decoding instruction. (2/26/08 Tr. 59-60)  She also used blocks and clay and letter magnets to incorporate a tactile input.  To enhance comprehension, Gordon allowed the students to act out stories they had read.  Getting the students up on their feet to role play also helped them to remain attentive.  (2/25/08 Tr. 205-08)  Most of Gordon's instruction was to small groups, but students also received about fifteen minutes a day of individualized reading instruction.  (*Id.* at 206, 208)

To reinforce her direct instruction, Gordon allowed the students to work independently on the computer for another fifteen minutes a day.  (2/25/08 Tr. 90)  J. primarily practiced phonics skills using the Lexia and Earobics programs.[7]  Despite the AT evaluator's specific recommendation that  J. use Co:Writer and Write:Outloud to bolster his writing skills, Gordon conceded that she only allowed J. to use these programs once or twice.  (*Id.* at 91)  She believed that J. could write by hand even though it was "slow going."  She also noted that second and third grade students are not expected to complete many writing assignments. (*Id.* at 95-96)

With respect to science and social studies, Gordon noted that J. was unable to read the textbooks for those classes.  As specified by his IEP, Gordon introduced the concepts his peers were learning by providing books and materials that were on J.'s reading level.  (2/26/08 Tr. 64-66, 83-83)

Ms. Gordon testified that J.'s academic struggles were due in part to his lack of motivation.  Sometimes he didn't want to do the work or complained it was too hard.  To address his frustration, Gordon modified J.'s assignments by reducing his work load.  (2/25/08 Tr. 213-16)  Gordon also believed J.'s performance was hindered by his lack of organization. (2/26/08 Tr. 66-67) As noted above, she included an independent functioning goal on his IEP to address that issue.  The goal focused on J.'s need to improve his organization at two key transitions times: the beginning and end of the school day.  (HX 2 at SD 145)  Gordon testified that J.'s organization skills improved as a result.  (2/26/08 Tr. 66-67)

---

[6] Though the IEP refers to that time as reading and language arts, the goals make clear that the focus was on improving J.'s reading skills.  (*See* HX 2 at 141)

[7] Ms. Gordon testified that there were also math software programs available for the students to use.  This was not area of focus at the hearing since math is an area of relative strength for J.

Gordon testified that in her opinion, J. made acceptable academic progress during the 2005-06 school year.  She conceded that KTEA scores showed limited progress in reading -- three months in a year's time.[8]  She asserted that this limited progress was not surprising given J.'s learning weaknesses.  (2/26/08 T. 88-89)  Moreover,  J. made nearly a full year's gain in spelling.  In math he went from a 2.1 to a 3.2 grade level in math computation. (*Id.* at 98)

- **Speech and Language**

J.'s 4/25/05 IEP included speech and language therapy for thirty minutes each week.  (HX 2 at 146)  Lisa Rhodes wrote the speech and language goals for J.'s IEP, and also provided him with the therapy.  The present level of performance is not objectively measurable but states that "John is able to answer "wh" questions from stories read."  (*Id.*)  The annual goal states that J. will increase his language skills through comprehension and sequencing activities from the classroom curriculum.  The benchmarks correspond to the annual goal, requiring that J. will listen to a story, answer  questions, and sequence events with increasing accuracy --from 50-70 percent -- as the year progressed.  (*Id.*)   There is no indication whether J. met these benchmarks, though Ms. Rhodes testified that he did.

- **Occupational Therapy**

 Though it was not included in the April 2005 IEP, the team revised J.'s IEP at the beginning of his third grade year to include thirty minutes per week of direct occupational therapy for J.  (9/30/05 IEP Revision, SD 130, HX 4).  Deborah Scott, a CPS occupational therapist, wrote the OT goal and benchmarks and provided the therapy to J.   The OT goal focused on improving J.'s printing skills.  (*Id.* at 132)  According to Ms. Scott, J. achieved the goal of properly printing his first and last name. They then focused on improving J.'s writing throughout his assignments.  At the end of the 2005-06 school year,  J. had reached a point where he could produce legible classroom assignments with minimum cues.  Scott, therefore  recommended that OT be provided to J. on a consultative basis. (4/6/06 Occupational Therapy Summary, SD 118, HX 45)  Scott noted that has glasses but often doesn't wear them.  She required J. to wear them for their sessions because his writing improved when he did so.

- **J.'s Three Year Reevaluation and the April 6, 2006 IEP**

In the spring of his 3rd grade year, the District completed a three year triennial evaluation of J.  Cynthia Christian, a CPS school psychologist, administered the Wechsler Intelligence Scale for Children, the Kaufman Test of Educational Achievement and two behavior observation scales (the BOSS and the Conner Rating Scale) to determine whether J.'s behavior was indicative of attention deficit hyperactivity disorder. (3/26/06 Report of Psychological Evaluation, SD 115, HX 11)

---

[8] To be precise, J.'s IEP provides a baseline reading grade level score of 1.2.  (HX 2, SD 141) When the KTEA was
    subsequently administered in March, 2006, however, the results showed that J. functioned at a 1.5 grade level in
    reading comprehension and 1.7 grade level in letter and word recognition.  (3/23/06 KTEA protocol, HX 64)

The results of the WISC indicated that J. was functioning in the low average range of cognitive ability, with individual subtest scores ranging from low average to average.  These scores prompted Ms. Christian to conclude that J. was not cognitively impaired, but instead, was learning disabled.  (*Id.* at SD 116-17)

On the KTEA, J. received the following scores:
Letter and Word Recognition:  S.S. 81, Gr. 1.7
Reading Comprehension:  S.S. 77, Gr. 1.5
Spelling:  S.S. 90, GR. 2.6
Math Concepts/ Application:  S.S. 88, Gr. 2.5
Math Computation:  S.S. 98, Gr. 3.2[9]

With respect to the behavior observation and rating scales,  the BOSS indicated that J. was off task 70 percent of the time as compared to his peers who were off task 50 percent of the time.  In addition, the Parent and Ms. Gordon were asked to provide their observations about J.'s behaviors. Their answers were inconsistent, with the Parent recording more instances of oppositional behavior, inattentiveness and hyperactivity than was observed in the classroom by Ms. Gordon.  Though Ms. Christian did not expressly diagnose J. with ADHD, she recommended that J. would benefit from classroom modifications to address his lack of focus and distractibility.  (*Id.*)

Ms. Rhodes also completed a speech and language assessment as part of the three year reevaluation.  (4/4/06 Speech -Language Assessment Summary, SD 122, HX 13)  She concluded that J. exhibited both receptive and expressive language deficits.  Receptive language was measured to be in the moderately low range, and J.'s expressive language score fell within the extremely low range.  (*Id.* at 123b)  According to Rhodes, these scores indicated that J. was eligible to continue receiving speech and language therapy.  (*Id.*)

The team met on April 6, 2006 to discuss the results of the reevaluation and to write an IEP for J. for the coming year.  The most significant outcome of the meeting was the team's decision to change J.'s placement from a self-contained classroom to a regular classroom with resource room support.  (4/6/06 IEP, SD 91,105, HX 9)  The decision was based in part on the results of the psychological evaluation, which indicated that J. was not cognitively delayed, but in fact had low average intellectual ability.  Moreover, that finding was consistent with Ms. Gordon's opinion that J. was making progress on his IEP goals. (2/26/08 Tr. 77-8)

Under the new IEP, the amount of time that  J. received special education instruction was significantly decreased from 1230 to 430 minutes per week.  J. was to receive 400 minutes per week of language arts instruction (reading decoding and comprehension), and speech and

---

[9] In her report, Ms. Christian only recorded the KTEA grade equivalent scores,  not standard scores.  At the hearing, she was asked to provide the standard scores, because they allow one to compare a student's performance on different tests.  The KTEA had previously been given to J., allowing comparison of scores.

language for thirty minutes a week. (HX 9 at SD 104)   OT was changed from direct instruction to consultation.  (*Id.* at SD 100)  J. was to receive instruction in math, science, social studies and language arts in the regular classroom.  The IEP specifies a number of modifications to assist J. to succeed in this environment including, use of assistive technology, extended time on tasks, and regular review, to name a few.  (*Id.*)  With respect to AT, there once again is no mention of a specific type of AT that should be used, or how it was to be implemented.  The team also determined that J. did not qualify to participate in extended school year instruction.  (*Id.* at 98)

As noted above,  J.'s IEP includes two reading goals -- decoding and comprehension.  Both indicate that J.'s present level of performance is "low 2nd grade."  The goals and benchmarks are specific and measurable.  (HX 9 at SD 101-02)  Ms. Gordon testified that she added a goal for reading  comprehension because it was an area of need for J., and because content becomes more difficult as students progress to the higher grades. ( 2/26/08 Tr. 75) She also raised expectations for J. by requiring that he demonstrate 70 percent accuracy instead of the 60 percent accuracy required the previous year. (HX 9 at 101)

The IEP includes a speech and language goal that focuses on improving J.'s expressive language skills.  Though there is no assessment data included in the present level of performance, the goal and benchmarks are clear and specific.  They require J. to increase his expressive language skills by producing simple, grammatically correct sentences.  The benchmarks also require steady improvement from 50 to 70 percent accuracy.  (*Id.* at 103)

Ms. M. attended the April 6 IEP meeting and provided input.  (*See* 4/6/06 M. letter to Montelione, SD 275, HX 15)  She disagreed with the team's decision to change J.'s placement from self-contained to a resource room, and on April 11, 2006, she wrote the case manager a letter expressing her disagreement and requesting another IEP meeting.  (4/11/06 M. letter to Montelione, SD 274, HX 14)  The case manager refused her request, stating that the team had decided to implement the IEP and, if necessary, would write a revision in the future.[10] (4/19/06 Montelione letter to Ms. M., SD 273, HX 16)

Ms. M. was not satisfied by Ms. Montelione's response and she persisted in her attempts to change the team's decision. On April 21, she wrote a letter to CPS District Specialist Gale Baker requesting that J. be allowed to attend summer school.  (4/21/06 M. letter to Baker, SD 272, HX 17)  On May 17, she renewed her request to Ms. Montelione that another IEP meeting be scheduled.  (5/17/06 M. letter to Montelione, SD 271, HX 18)  In this letter, Ms. M. refers to the fact that J. has been placed in a regular third grade class and specifically states that "this recent placement is inappropriate…& is denying my son a free appropriate education." (*Id.*)  She then lists several reasons in support of her position including, "the reading & language level of his class work & homework is inappropriate," and "every day he comes home frustrated & telling

---

[10] At the hearing, the case manager, Ms. Montelione, stated that she did not consider Ms. M.'s letter to be a dissent because Ms. M. stated that she "disagreed" with the IEP.  Ms. Montelione conceded that if Ms. M. had stated that she "dissented" with the IEP instead of saying that she "disagreed" with the IEP, Ms. Montelione immediately would have scheduled another IEP meeting. (Tr. 118-19)

9

me …that he doesn't understand the work in Ms. Boyd's class." (*Id.*)  Significantly, Ms. M. concludes by stating, "I would like him to be placed back into the special education class, *because he was making a lot of progress in that class.*" (*Id.*) (emphasis added)

In response to Ms. M.'s concerns, the team met again on June 8, 2006.  (6/8/06 IEP, SD 84, HX 19)  Ms. M. attended and provided a letter in which she listed seven ideas that would help her son meet his IEP goals, including: a paraprofessional to help J. with reading, sitting J. in the front of the class, reducing homework assignments, and after school or Saturday tutoring.  (6/8/06 M. letter to Montelione, SD 270, HX 20) Ms. M. reiterated her belief that J.'s needs had been met in the self-contained classroom when she stated:  "The teaching strategy & method needs to be similar to Mrs. Gordon's way of teaching.  This method & strategy is the reason why my son has made progress." (*Id.*)  As a result of this meeting, the team revised J.'s IEP to include additional modifications of a peer tutor and a homework journal for J. (HX 19 at SD 85)

Ms. M. was not satisfied with the two modifications and wrote another letter on June 14, 2006, in which she stated that she disagreed with J.'s IEP.  (6/14/06 M. letter to Montelione, SD 269, HX 21)  She renewed her request for a paraprofessional instead of a peer tutor, and requested that J. be given more help in science, social studies and math because these subjects had higher reading levels than what J. was capable of reading.  (*Id.*) The next day, Ms. Montelione responded by requesting that the school be given five weeks to implement J.'s IEP and measure its effectiveness.  (6/15/06 Montelione letter to M., SD 268, HX 22)  One day after that, the principal at Evers School wrote to Ms. M. to inform her that, "Effective today, J. is being transferred back to his home school, Wacker, where he will be able to receive all of his special education services." (6/16/06 K. Singleton letter to M., SD 267, HX 23)

## J.'s Fourth Grade Year

Because of his transfer, J. began attending Wacker at the beginning of his fourth grade year.  (2006-07)  Consistent with the 4/6/06 IEP, J attended a regular classroom. His teacher was Ms. Ladislas.  He also received daily special education instruction from resource room teacher, Tonisia Smith.

Ms. Ladislas described J. as a "learner" who did the same work as the rest of the class with some modifications and accommodations. In reading, Ladislas testified that J. enthusiastically participated in her group reading lessons.  In fact, Ladislas testified that she believed J. read on 4th grade level.[11]  The teacher conceded, however, that she made accommodations to assist him in reading.  In particular, each week, Ladislas sent home tapes of the stories that the class was reading.  J. listened to the stories at home, which enabled him to successfully participate in the group reading lessons.  J. was less interested in the accelerated reading program, which required him to select a book and read independently in class for forty minutes at a time.  According to Ladislas, J. often put his head down on his desk instead of reading.  Likewise, J. was unable to keep up with the required reading in science and social studies.  He required a modified grading

---

[11] This testimony is at odds with virtually all of the other evidence in the record indicating that J. reads at least two years below grade level.

10

scale to enable him to be succeed. In assigning grades, Ladislas also put greater emphasis on J.'s classroom participation and hands-on work than on his written work. Indeed, Ladislas conceded that in order for J. to succeed in science, she had to modify assignments and grading even more than J.'s IEP specified.    Because J. also struggled with written expression, Ladislas didn't require J. to write lengthy assignments, but often allowed him to respond orally.    Ladislas stressed, however, that J.'s written expression improved during the course of the year from writing one sentence to being able to write a paragraph.

As noted above, Ms. Ladislas modified J.'s grades.  On a November 8, 2006 progress report, for example, J.'s average score in reading was a 70.97.  The progress report indicates that this grade is a D.  For J. however, the grade was modified to a C.  (11/8/06 Progress Report, PD 540, HX 60)  This progress report also indicates that J. received a number of D's and F's on individual reading assignments, and that he failed to complete several homework assignments.  With the modified grading scale, J. received mostly B's and C's on his report card. The report card specifies that the grades reflect a "significantly modified curriculum." (*See, e.g.,* Report of Student Achievement, PD 552, HX 73)

Besides Ms. Ladislas,  J. received daily instruction and support from Ms. Smith, the resource room teacher.  Smith is an experienced special education teacher who clearly is committed to providing effective instruction to her students.  Ms. Smith is a strong advocate of the resource room model because it allows students to attend a regular classroom and receive instruction with their non-disabled peers. This, in Ms. Smith's opinion, motivates students with special needs and provides them with positive peer models.  Smith believes this has been true for J.  As Smith put it, J. is doing "so much better."

Ms. Smith testified that when J. arrived at Wacker in the fall of 2006, she gave him more support than what was specified in his IEP because he was making the transition from a self-contained class to a resource room.  Specifically, Smith testified that she regularly observed lessons being taught by Ms. Ladislas. Once the lesson was completed, Ms. Smith worked with J. on the assignment(s) related to the lesson.[12]  (*Id.* at 214-15)

In addition to offering support for regular classroom assignments, Ms. Smith taught J. reading decoding and comprehension.  She used the multisensory intensive phonics program to teach decoding.  (Tr. 210- 212)   Smith taught comprehension by incorporating J.'s science and social studies lessons. As in Gordon's class, Smith provided both small group and individual reading instruction. Given that J.'s IEP provided him with 400 minutes per week in the resource room, the amount of time that Smith could devote to reading instruction was significantly less than the 720 minutes per week that J. received in the self-contained room.

---

[12] Ms. Smith testified that she  has continued that pattern of observing the regular classroom teacher present a lesson, and then working with J. to reinforce what has just been taught.

- **Speech and Language**

In the fourth grade, J. continued to receive thirty minutes per week of speech and language instruction. His therapist, Ms. Gary, testified that J. seemed sad when she first began seeing him. She attributed his sadness to the fact that kids teased J. because he spoke with incorrect syntax. She addressed the problem in her therapy and believes the problem has been resolved. (Gary Testimony, Tr.. 11-12) Gary initially saw J. with a small group of boys. She conceded that J. was afraid of being teased by the other boys in the group, but still participated in the sessions. Gary ultimately switched J. to individual therapy, however, because she believed that J. had become too reliant on the other boys, allowing them to answer for him.

With respect to the content of the lessons, Gary testified that she followed the IEP benchmarks. When asked why J. didn't receive more therapy time, Gary testified that she believes J. exhibits a mild to moderate level of speech and language impairment. According to the state guidelines, thirty minutes per week is the right amount of therapy time for a student with that level of involvement.(Tr. 27-28) She further testified that 30 minutes a week was appropriate as evidenced by J.'s progress, and because he met his IEP goals. (*Id.* at 35)

- **Assistive Technology Evaluation**

About a month after J. arrived at Wacker, Ms. M. requested an IEP meeting to address the issue of assistive technology. (10/5/06 IEP, SD 73, HX 50) The team complied with her request. In preparation, the team decided to update J.'s previous assistive technology evaluation to determine whether AT was still warranted. (*Id.* at SD 74) The evaluation was completed on November 15, 2006. (11/15/06 Evaluation Report, SD 70, HX 64) The evaluator made several observations including that J. had difficulty "decoding words using a phonetical approach," and that J. had problems with "phonological awareness and processing," which may have hindered his reading and comprehension abilities. (*Id.* at SD 71) The evaluator also noted that J. had difficulty with spelling and writing. (*Id.* at SD 72) She concluded that assistive technology would benefit J. in his deficit areas, and specifically recommended software that would present sounds and letters in a consistent format, a phonics program that presents both visual and auditory cues to help J. develop adequate decoding and encoding skills, and a word prediction program with auditory feedback. (*Id.*)

In response to the evaluator's recommendations, the school received a variety of AT tools to use with J. including, Kurzweil, Co-Writer, Write Out Loud, and Lexia. (12/11/06 CPS record of assistive technology issuance, SD 68, HX 29) Ms. Smith testified that she participated in several training sessions to learn how to best use these tools with J. and other students. (Tr. 231-32) Smith testified that AT has been effective to reinforce a concept that J. has already been taught. While Smith will sit with J. when he is working on the Lexia (phonics) program, J generally works independently on the computer.

- **The March, 2007 IEP**

12

J. attended the regular classroom and received support from Ms. Smith throughout his 4th grade year. At the end of March, 2007, the team wrote a new IEP for J. (3/29/07 IEP, SD 49, HX 51) Like the previous one, this IEP provided 400 minutes per week of specialized instruction in reading and language arts, and thirty minutes per week of speech and language therapy. While the previous IEP included two reading and language arts goals, in this IEP, there is only one goal. It does not provide a specific present level of performance, but merely states that J. functions "below his current grade level." (*Id.* at 55) Moreover, the annual goal, which focuses on improving fluency and word attack concepts, is not stated in measurable terms. The benchmarks are unclear, mixing decoding and comprehension as part of the same task. Moreover, two of the three benchmarks do not establish the level of accuracy that will be required. Ms. Smith conceded that goals and benchmarks were not specific as to these elements. But she testified that she measured J.'s proficiency through teacher prepared assessments, and that J. met the requirements of each benchmark.

In addition to the language arts goal, the IEP includes a goal for speech and language. Though the measurable annual goal is somewhat vague, ("John will increase his overall language abilities.") the benchmarks are well written and measurable. (*Id.* at 56)

**J.'s Fifth Grade Year**

Throughout the current school year J. has attended Ms. Bridges class, which is comprised of 34 fourth and fifth graders. (Bridges Testimony, Tr. 154) He continues to receive resource room support from Ms. Smith. At the beginning of the year, J. received the services specified on his 3/29/07 IEP. Several weeks after Ms. M. requested a due process hearing, the parties convened an IEP conference in an attempt to resolve the dispute. (*See* 12/20/07 IEP, SD 12, HX 33). The team considered a Social Assessment completed by the school social worker, and an independent interdisciplinary assessment conducted at the University of Illinois at Chicago. As a result of the meeting, the team revised J.'s IEP by increasing his resource room instruction to 540 minutes per week to work on spelling, decoding, vocabulary, comprehension and math. (*Id.*) The team also added 15 minutes per week of social work services. (*Id.*) J.'s IEP was revised again on 2/21/08 to increase his speech and language therapy to 60 minutes per week, and to update and clarify assistive technology accommodations. (2/21/08 IEP, SD 316, HX 30)

Ms. Bridges testified about J.'s performance in her classroom. She stressed that she works closely with Ms. Smith each week to plan J.'s instruction. (Tr. 160) J. participates in the classroom lessons and activities. He is required to do the same work as the other students, with some modifications, such as shortened writing and homework assignments. (*Id.* at 164) Ms. Smith supports regular classroom instruction by helping J. when he has difficulty understanding assignments. She also reviews J.'s homework assignments with him. Because J. has particular difficulty with science and social studies, Smith teaches vocabulary and reading comprehension using content from those subjects. (*Id.* at 163)

When questioned about J.'s motivation, Ms. Bridges stated that J. acts sleepy, and puts his head down on his desk from time to time. (Tr. 164-65) She noted, however, that she has implemented an incentive system whereby J. earns rewards for being motivated and turning in assignments.

Since she implemented the system in December, Bridges reports that J. is doing well and she sees less "head down" behavior. (*Id.* at 170-71)

Bridges believes that J. is succeeding in her classroom with the modifications and resource room support. She testified that he currently is earning C's in his academic subjects. (Tr. 197-98) Though his assignments are modified, Ms. Bridges testified that she follows the regular grading scale. (*Id.*)

Ms. Smith supports J.'s efforts in the regular classroom. She also teaches reading to J. His instruction is more intensive since the 12/20/08 IEP revisions. Specifically, Ms. Smith stated that J. receives 4 hours a week of reading instruction using the multisensory based Wilson method.[13] He also receives instruction to strengthen his comprehension. To augment his reading instruction, J. now spends at least 40 minutes per day working on the computer.

Diane Brann, is the school social worker who completed the social assessment, and she testified about her report. According to Brann, J. had not been assessed previously because he does not display behaviors at school that would lead to a referral. (Brann Testimony, Tr. 117-18) She conducted the assessment in response to the Parent's request. (12/20/07 Social Assessment, SD 22, HX 38) Through her interviews with teachers and with the Parent, Ms. Brann learned that J. struggles at times with a lack of motivation. (Tr. 112) A classroom observation revealed that J.'s behavior is age appropriate and that he enjoyed interacting with his peers. Though he was off task at times, he was easily redirected. (*Id.* at 113) To address the Parent's concerns, Ms. Brann recommended that J. receive 15 minutes per week of social work services to help improve J.'s motivation. (*Id.* at 114) She has met with J. several times since the December IEP meeting, and that she is very pleased with J.'s progress. (*Id.* at 116-17)

**Independent Educational Evaluations**

The Parent has sought input from various educational professionals outside CPS who have evaluated her son and provided reports. The relevant portions of their testimony is summarized below.

- **Dr. Theus**

Dr. Frederika Theus is a clinical psychologist employed by the Family Clinic at the University of Illinois at Chicago. In September, 2007, Dr. Theus was involved in conducting an interdisciplinary assessment of J. (HX 32) The evaluation included a medical, psychosocial, and psychological evaluation. The team consulted on their results to provide findings and recommendations. Dr. Theus did not conduct any portion of the evaluation. Instead, she

---

[13] Smith became familiar with the Wilson method several years ago by attending a Wilson training session. Smith then taught the method at another CPS school where the materials were available. She has received additional training in the Wilson method from Carol Condron, a CPS itinerant special needs teacher. Though Ms. Condron is not a certified Wilson trainer, she is an experienced reading specialist with a background in learning disabilities who has had a good deal of experience with the Wilson method.

supervised the administration of the psychological evaluation done by Andrea Hahn, M.A. (Theus Testimony, Tr. 11)  Ms. Hahn administered the Wechsler Intelligence Scale for Children, the Wechsler Individual Achievement Test, and various behavior rating scales.  (HX 32 at SD 39)  Though Dr. Theus did not work with J., I found her to be a knowledgeable and credible witness in explaining the results of the UIC assessment.

According to Dr. Theus, the results of the WISC indicate that J. functions in the low average range of intelligence, with a full scale IQ of 84.  Theus believes that the difference between J.'s verbal comprehension index (81) and his perceptual reasoning index (94) is significant and could indicate a learning disability. (Tr. 14)

On reading subtests of the WIAT,  J. received a standard score of 77 in both decoding and comprehension.  These scores fall within the borderline range of ability and indicate that reading is an area of deficit.  Math scores were low average to average.  J.'s written language scores indicate that J. has average ability in the area of written expression, but spelling is borderline. [14] The UIC report diagnosed J. as having a reading disorder and ADHD. [15] (*Id.* at SD 45)  The report offers a number of recommendations including:

> (a)   That J. continue to receive learning disabilities services with a highly intensive and structured program that focuses on his deficits in reading, spelling mathematics, written expression and the content areas;

> (b)   That the Lindamood Bell program be used to teach reading and spelling to J.; [16]

> (c)   Long and/or complex assignments be broken down into smaller parts;

> (d)   Seating in the front of the classroom;

> (e)   An OT evaluation;

> (f)   Reduced written work, including the use of multiple choice and fill-in-the-blank tests;

> (g)   Computer software to develop written language skills, such as Write:Outloud. (*Id.*)

---

[14] Dr. Theus cautioned that although J.'s overall written expression score showed average ability, testing indicated that he has significant difficulty writing sentences and paragraphs.  (Tr. 35-36)

[15] The ADHD diagnosis is somewhat puzzling given the fact that the rating scales indicate that J. demonstrated normal to slightly atypical behaviors that are indicative of ADHD and hyperactivity.  (*Id.* at SD 39)  J. did exhibit problems with inattention, however.  (*Id.* at 39-40)

[16] Dr Theus described the Lindamood Bell instructional program as being a multisensory, phonemic approach, which she has used and believes to be particularly effective.

In response to questioning Theus conceded that she has recommended placement in a therapeutic day schools for other students, but she did not do so here.  (Tr.42)

- **Mary Block**

Ms. Block is an experienced occupational therapist who has provided students with therapy in school and clinical settings.  She conducted an OT assessment of J. in February, 2008.  (Occupational Therapy Evaluation, PD 594, HX 43)   Though she stated she believed her results were reliable, she conceded that she wasn't sure J. was giving his best effort.  (Block Testimony, Tr. 155-56)  Specifically, Block stated that J. lacked motivation and needed redirection during the assessment.  He had difficulty remaining on task, and also required several reminders to wear his glasses appropriately.  (HX 43 at PD 595)  In an effort to try to get an accurate picture of J.'s true abilities, Block testified that she went outside the standardization for administering some of the measures.  In doing so, Block testified that J. showed he could do more than he initially indicated.  (Tr. 157-58)

Block administered instruments that measured J.'s visual motor and visual perception skills, as well as gross motor skills.  She stated that his scores ranged from below average to average.  With respect to his abilities as they relate to his school work, Block noted that J. grasps his pencil in an awkward way, which impacts his ability to stay within boundaries.  (Tr. 162)  Significantly, Block did not testify that CPS' OT services were inadequate.  Instead, she stated that the "school OT did a great job" teaching the elements of handwriting.  (Tr. 169)  She believes, however, that J. still needs help learning to space letters correctly and recommended that J. receive direct OT services for one or two grading periods.  Once J.'s spacing improves, Block stated that OT services could return to consultative.  (Tr. 170-71)

- **Janet Marsden-Johnson**

Dr. Marsden-Johnson is a speech and language pathologist currently in private practice.  She holds degrees in speech and language pathology.  She also has a Ph.D. with a focus on augmentative and alternative communication.  (Marsden-Johnson Testimony, Tr. 128)  As part of her practice, Marsden-Johnson conducts speech and language evaluations as well as providing therapy to children.  (*Id.* at 126-27)  She also conducts assistive technology assessments.  (*Id.*)  In response to the Parent's request, Marsden-Johnson conducted a speech-language and assistive technology assessment of J.  (*Id.*)

According to Marsden-Johnson, J. worked hard during her session with him.  At times, however, he complained of being tired and needed redirecting.  In general, he took direction well, and Marsden-Johnson believes her results accurately reflect J.'s ability.  (*Id.* at 129-30)   As part of the language assessment, Dr. Marsden-Johnson administered the Peabody Picture Vocabulary Test, the Expressive One Word Picture Test, and the Test of Auditory Perceptual Skills.  (Speech-Language and Assistive Technology Evaluation, PD 435, HX 27)  The results indicated that J.'s single word receptive vocabulary is "solidly in the average range," and his expressive vocabulary is in the moderately low range.  (*Id.* at PD 436)  On the TAPS, J. scored within the average range for all of the lower level processing skills.  These skills, according to Marsden-Johnson, are basic requirements for reading and spelling.  (*Id.* at PD 437)  J.'s scores fell below

16

the average range for more linguistic tasks such as word and sentence memory. He scored lowest in auditory reasoning, the most complex form of auditory processing. (Tr. 133)

Based on these results, Dr. Marsden-Johnson recommended that J.'s services be increased to 60 minutes per week, with a continued focus on expressive language and higher level language skills. (Tr. 150) While she believed that J.'s IEP was deficient with respect to the amount of time J. received therapy, she did not criticize the IEP goals. Indeed, when shown the speech and language goal included in J.'s 2/21/08 IEP, she responded, "It's a great goal." (*Id.* at 157) She did have concerns, however, that the goal might be repetitive of an earlier IEP goal. (*Id*. at 160)

As noted above, Marsden-Johnson also administered an assistive technology evaluation. In preparation for the evaluation, she reviewed AT Evaluation Reports conducted by CPS. (Tr. 153) She testified that she agrees with the recommendations in the most recent CPS AT evaluation. (Tr. 153, HX 64) Marsden-Johnson also reviewed a list of assistive technology products that CPS has made available to J., such as Kurzweil, Co:Writer and Write:Outloud. (*Id.* at 153-54; CPS list of AT products, HX 29) She was surprised, therefore, when J. did not seem to be familiar with those products during the AT evaluation, and questioned whether J. actually has been using it. (Tr. 153-55)

Marsden-Johnson stressed that at his age, J.'s language deficits negatively impact reading and writing. These deficits can be improved through the use of assistive technology. To illustrate, she described how J. read a chapter of a book using an AT product, which allowed him to listen to the story and follow along. Afterwards, J. received a perfect score on a factual quiz about the story. (Tr. 137-38) She followed up by asking J. to read the next chapter of the story aloud, without the use of AT. Though he tried very hard, Marsden-Johnson reported that J. finally put his head down and said, "I quit. I can't do this anymore. Why won't you let me do this on the computer?" (*Id.* at 139)

Similarly, Marsden-Johnson also assessed the impact of AT on J.'s written work by asking him to complete a writing assignment with and without AT. The quality of J.'s work, according to Marsden-Johnson, and the speed at which he was able to complete the task greatly improved when he was allowed to use Co:Writer and Write:Outloud. (Tr. 146) She also stressed that with the AT, J. enjoyed what he was doing, and even was excited that he was able to write so much. (*Id.* at 145- 47) Accordingly, Marsden-Johnson recommended that J. be provided with assistive technology support for at least 45 minutes a day. (HX 27 at 439) She stressed that in order to benefit from the products, J. and classroom staff must receive the appropriate training. (*Id.*) Some of the specific products recommended include: Write:Outloud, Co:Writer, Kurzweil 3000, Earobics, and Simon Sounds it Out. (*Id.*)

- **Kathryn Conway**

Ms. Conway is a clinical supervisor of the Star Learning Academy at Saint Xavier University. (Conway Testimony, Tr. 121) At Star, graduate students provide instructional services to students with special needs. (*Id.*) J. attended Star in the summer and fall of 2007 for reading instruction. (Summer 2007 Star Learning Academy Report, PD 472, HX 41; Fall 2007 Report,

PD 480, HX 42)   Ms. Conway got to know J. in her role directly overseeing instruction, and because she had the opportunity to work with him on occasion.  (*Id.* at 126)

According to Conway, J. received individual and small group instruction using the Wilson Reading Method.  Upon his arrival, J was given a Woodcock-Reading Mastery Test and the Basic Reading Inventory to provide a baseline level of performance.  The test was re-administered to assess his progress at the end of the summer and fall sessions.  (HX 41, PD 475; HX 42, PD 482)  Conway testified that J. responded well to the Wilson method of instruction. (Tr. 127)  The results indicate that by the end of the summer and fall sessions, J. had gained a full year--(from second to third grade -- in word recognition at the independent/instructional level.[17]  His reading comprehension also increased from first to second grade at the independent level.

- **Elizabeth Vandermar**

Ms. Vandermar provided further testimony about the effectiveness of the Wilson method. Vandermar is an experienced special education and reading teacher.  She received training and began teaching the Wilson method in 1991.  She became a certified Wilson trainer in 1996. Ms. Vandermar has not met J.  Instead, she interpreted J.'s Star Academy Reports from her perspective as a Wilson trainer.

Ms. Vandermar noted that  the reports indicate J. was reading real and nonsense words at a 2.1 level at the end of the fall 2007 session.  (*See* HX 42, PD 483-84)  This level is somewhere between a first and second year grade level, which for J., is very low.  Based on her review of the Star reports, Ms. Vandermar nevertheless believes that J. was making progress with the Wilson method, and that he should continue to receive intensive Wilson instruction.  Intensive instruction is two to five lessons a week working one-on-one with an instructor for 60 to 90 minutes; or small group instruction  three to five times a week for 60 to 90 minutes.  (Wilson Informational Materials, PD 604, 653, HX 97)

## CONCLUSIONS OF LAW

This is a case in which the Parent asserts that the District failed to provide J. with FAPE in virtually every aspect of his education.  In assessing the Parent's specific assertions, it is important to discuss the legal framework underpinning my analysis.

First, the Parent is the party seeking relief in this case and, as such, bears the burden of proof. *Schaeffer V. Weast,* 546 U.S. 49, 62 (2005)  Put another way, it is the Parent's burden to present sufficient evidence to support her allegations that the District failed in its obligations to provide J. with a free and appropriate education.

---

[17] The report measured J.'s independent, instructional and frustration levels of performance.   (*Id.*)

Second, the starting point to any inquiry concerning the adequacy of educational services is *Board of Educ. v. Rowley,* 458 U.S. 176, 188-89 (1982).  That case established that a free appropriate public education is an education "specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction."  In *Rowley,* the United States Supreme Court set forth a two pronged test to determine whether a school district has offered a student FAPE.   The first inquiry to be made is whether the school district has complied with the statutory procedures required by IDEA.  (20 U.S.C. 1401 et seq.)  The second prong of the *Rowley* test is whether the district has developed an IEP  reasonably calculated to enable the child to receive an educational benefit.  *Rowley* at 206-07.

While there is no bright line test to define what constitutes FAPE, *Rowley* requires a school district to provide a "basic floor of opportunity" in the form of specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child. *Id.* at 201.  An individualized education plan is acceptable "when it is 'likely to produce progress, not regression or trivial educational advancement.'" *Alex R., ex. Rel. Beth R. v. Forestville Valley Community Unit School Dist. # 221,* 375 F.3d 603, 615  (7th Cir. 2004)*(quoting Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.,* 118 F.3d 245, 248 (5th Cir. 1997)).  The purpose of IDEA, however, is to "open the door of public education to handicapped children, not to educate a child to her highest potential."  *Board of Education of Murphrysboro Comm. Unit. Sch. Dist. No. 186 v. Illinois State Board of Educ.,* 41 F.3d 1162, 1166 (7th Cir. 1994)  Finally, IDEA creates a strong preference in favor of mainstreaming, or educating a child in the least restrictive environment.  *See Beth B. v. Mark Van Clay,* 282 F.3d 493, 496 (7th Cir. 2002). The LRE is one that allows the disabled child to be educated with his or her nondisabled peers to the greatest extent appropriate. *Id.* at 498

With a few exceptions, I conclude that the District has provided J. with FAPE.  On the whole, I found CPS witnesses to be experienced professionals who conscientiously attempted to meet J.'s educational needs, and who attempted to respond to Ms. M.'s requests and concerns.  The parties reached an impasse, however, and the seeds of this proceeding were sown, when the District placed J. in a regular classroom with resource room support.  Ms. M. strongly disagreed with that placement and wanted J. returned to a self-contained classroom. But the District did not comply with her request, since the team believed that a regular classroom was the least restrictive environment appropriate for J.  I agree with the District that a regular classroom with resource room support is the least restrictive environment for J.  The District failed, however,  to strike the right balance between regular education and remediation by limiting J.'s time in the resource room to only 400 minutes per week.  The primary consequence of this time imbalance is, that District failed to provide J. with adequate reading instruction.

The District failed to provide J. with FAPE in other areas, as well.  Specifically, it failed to ensure that J. received appropriate assistive technology support as the CPS evaluations recommended.  It also denied J. FAPE by failing to provide him with sufficient time for language therapy.  Finally, in addition to inadequate time for reading instruction, procedural errors on J.'s 3/29/07 IEP  were so significant as to deny J. FAPE.

1. **Whether the District denied J. FAPE by failing to conduct adequate or timely assessments of all areas of potential disabilities**

The Parent's first contention is that the District failed to adequately assess J.'s potential learning disabilities, as well as his speech and language, occupational therapy and social emotional needs. This alleged failure prohibited the District from appropriately addressing all of J.'s learning and attentional difficulties.

The Individuals with Disabilities Education Act makes clear that a school district has the responsibility to conduct full evaluations to determine whether a child needs or continues to need special education and related services. 34 C.F.R. §§ 300.301(a), 300.303(a). In conducting an evaluation, the District must use a variety of assessment tools and strategies to gather relevant functional, developmental and academic information about the child. The assessments must be in a form most likely to yield accurate information on the child's abilities in all areas related to the suspected disability, including general intelligence, communicative status, social emotional status and motor abilities. *Id*. at §§ 300.304(b)(1), 300.304(c)(1) and (c)(4). In this case, the evidence demonstrates that CPS met its duty to conduct adequate, timely assessments.

- **The Psychological Evaluation**

First, with respect to the claim that CPS failed to adequately assess J.'s potential learning disabilities, the record shows that District conducted an adequate and timely triennial evaluation of J. The school psychologist administered the Wechsler Intelligence Scale for Children to assess J.'s cognitive abilities, and concluded that his scores were indicative of a learning disability, not cognitive impairment. She also administered the Kaufman to measure J.'s level of academic achievement in reading, math and spelling. While she only listed J.'s grade level scores, not standard scores, this did not preclude team members from assessing J.'s academic progress, since the scores could be compared to past Kaufman results.

The school psychologist also administered behavior rating and observation scales to assess whether J. exhibited symptoms of ADHD or other behavioral disorders. Though she did not diagnose J. with ADHD, she concluded that J. exhibited distractibility and a lack of focus and recommended that the IEP team address these issues by providing appropriate modifications.

The Parent points to the UIC evaluation as evidence that the CPS evaluation was inadequate. In fact, the CPS and UIC reports are remarkably similar in their findings. For example, both evaluators administered the WISC. Though they used different tests, (the Kaufman and the WIAT) both measured J.'s academic achievement. Finally, both evaluations included behavior rating scales. Based on their results, both examiners conclude that J. has a learning disability instead of cognitive delay. With respect to academic functioning, both the UIC and CPS evaluations indicate that J.'s greatest deficit is in reading with math skills falling within the low average to average range.

One difference between the two reports is that the UIC report diagnoses J. with ADHD and recommends that the Parent seek medication consultation.  The UIC report also recommends modifications to address J.'s ADHD including preferential seating, and breaking assignments into smaller components. While the CPS report doesn't diagnose J with ADHD, it does conclude that J. has attention deficits and recommends that the IEP team make appropriate modifications. The team heeded the psychologist's recommendation and included a number of modifications to address J.'s attention deficits including shortened assignments, frequent monitoring for on-task behavior, and use of verbal prompts to regain attention. *See* 4/6/06 IEP

- **The Speech and Language Evaluation**

CPS' triennial evaluation of J. also included a speech and language assessment.  The speech pathologist administered the OWLS, which measured J.'s listening comprehension, oral expression and provided an oral composite.  From these scores, she concluded that J.'s receptive language skills were in the moderately low range and that his expressive language skills were in the extremely low range, indicating a communication disorder.  She therefore referred J. for speech and language services.  During the 4/6/06 IEP conference, the team determined that J. should receive 30 minutes per week of language therapy aimed at helping J. increase his expressive language skills.

Though the Parent contends this evaluation was inadequate, it reaches the same conclusions as the independent evaluation by Dr. Marsden-Johnson.  Specifically, like the CPS evaluation, Marsden-Johnson found that J.'s receptive language is stronger than his expressive language. She recommended that J. receive language therapy to improve his expressive language and higher level language skills.  Though she recommended 60 minutes a week instead of 30, this difference does not indicate that the CPS evaluation was inadequate.  Rather, it raises the question of whether the IEP adequately addressed J.'s speech and language needs.[18]

- **The Occupational Therapy Assessment**

Though he was first referred for an OT evaluation by an assistive technology evaluator in December, 2004 (*See* HX 3), J. did not begin receiving OT services until September, 2005.  This delay is of concern, but the record does not establish that the delay is attributable to CPS. Neither does the record include the OT assessment that led to the provision of direct OT services for J. Thus, to judge the adequacy of that and subsequent assessments, I rely on the testimony of Mary Block, the independent occupational therapist, whose testimony confirmed that the OT therapy provided by CPS to J. has allowed him to make steady progress.  As Ms. Block put it, the CPS OT "did a great job" teaching the elements of handwriting.  She recommends only a short period of direct services to focus on remaining issues related to spacing letters. While Ms. Block also recommends that a sensory assessment be administered, I conclude that the evidence that J. slumps in his seat and was easily agitated as an infant is insufficient to warrant another assessment.

---

[18] This issue is addressed below.

- **Social Emotional Assessment**

The Student contends that CPS failed to timely assess J.'s social and emotional needs. The responsibility to identify and evaluate potentially disabled students arises from the District's child find responsibilities under IDEA.  Specifically, according to the law, school districts have a responsibility to identify, locate and evaluate all children residing within the district who have disabilities and are in need of special education and related services.  20 U.S.C. §1412 (a)(2)(3)(A) (*See also* Ill. Admin Code § 226.100)   A district may not simply rely on a parent to initiate this process.  Rather, a district's obligation is triggered when the district has reason to suspect a disability.  *See Jamie S. v. Milwaukee Public Sch.*, 519 F. Supp. 2d 870 (D. Wis. 2007).

Here, the evidence, however, does not support the conclusion that CPS should have suspected J. was a student in need of social work services.  Specifically, Ms. Brann, the school social worker testified that prior to the dispute over J.'s services, J. would not have come to her attention since he didn't display any behaviors that would have led to a referral.  Once the team decided to conduct a social emotional assessment, Ms. Brann met with J. and observed him in class, as well. She described J. as a "delightful young boy." Her classroom observations revealed that J. enjoyed interacting with other children, smiled frequently and interacted in an age-appropriate manner.  From her observations of J. and discussions with teachers, Brann learned that J. sometimes had difficulty remaining on task, but that he was easily redirected.[19]  Ms. Brann did not view J. as a student in need of social work services.  Nevertheless, because the Parent had requested support, and because teachers reported that J. had difficulty staying motivated, Brann recommended that J. receive 15 minutes per week of social work services to help address J.'s difficulties with motivation.[20]

On cross-examination, Ms. Brann conceded that the UIC report would have triggered further inquiry had she seen it earlier.  However, closer analysis reveals that the relevant portion of the report describes a strained relationship between J. and his mother.  Indeed, the report states that Ms. M. believed that J. exhibited bad behaviors with her, *but not at school*.  That admission, coupled with Brann's report and testimony, confirm that CPS did not fail in its duty to suspect and identify J. as a student in need of social work services.[21]

## 2. <u>Whether the District Failed to provide essential related services with adequate levels of intensity</u>

---

[19] Some of J.'s teachers testified that, in the past, students sometimes teased J.  While this is of concern, the Parent failed to demonstrate that it was a serious enough problem to trigger the District's child find obligation.

[20] That she believed J. could benefit from social work services is not indicative that J. demonstrated a special need. Brann made clear that she believes every student could benefit in some way from social work services.

[21] Also relevant is the fact that the UIC report doesn't recommend that J. receive social work services.  It simply recommends that J. be exposed to peers in park district or other structured recreational programs to help him develop social and play skills.

The Parent contends that the District failed to provide J. with related services -- i.e. speech and language, assistive technology, occupational therapy, and social work services -- with sufficient intensity to satisfy the requirements of FAPE.    As will be discussed below, the evidence indicates that the District failed to meet the requirements of FAPE in providing speech and language services and AT services to J.  It satisfied the requirements of FAPE with respect to OT and social work services.

- **Adequacy of Speech and Language Services**

First, with respect to speech and language, there is no real dispute concerning the adequacy of J.'s therapy goals.  As described above, both the CPS and independent evaluations indicated that J.'s therapy should target his expressive language deficits and higher level language skills. The relevant IEP's and testimony from the speech therapists indicate that is precisely what they did. What is in dispute is whether thirty minutes of therapy per week is sufficient, or whether FAPE required that J. should have received more.  Dr. Marsden-Johnson testified that, based on the severity of J.'s deficits, he should receive an hour of language therapy per week.  On the other hand, each of  J's speech and language therapists testified that they believed J. was able to make adequate progress with thirty minutes of therapy per week.

Closer analysis of the evidence reveals a determinative fact.  Ms. Gary,  J.'s language therapist from the fall of 2006 to November, 2007, testified that there are state guidelines that establish the amount of time for service based on the severity of a student's disability.  Students with a mild to moderate speech and language disability are recommended to receive 30 minutes per week of therapy.  Students with a moderate to severe disability should receive more time -- up to 90 minutes per week. Gary testified that in her opinion, J.'s deficits were within the mild to moderate range, making thirty minutes an appropriate amount of therapy.  Gary, however, failed to appropriately consider the results of J.'s April 2006 speech and language assessment, which indicate that J.'s receptive language scores fell within the moderately low range, and his expressive language scores were in the extremely low range.  Thus, according to the state guidelines described by Gary, J. required more than thirty minutes a week of speech and language therapy to address his extremely low expressive language deficits.  And since the most recent evaluation (completed by Dr. Marsden-Johnson) indicates that J.'s expressive vocabulary remains in the moderately low range, the team's recent decision to provide J. with sixty minutes a week of language therapy is appropriate.

- **Adequacy of Assistive Technology Services**

Second, with respect to assistive technology, the record indicates that an AT evaluator first concluded that J. should receive AT support in December, 2004.  She specifically recommended Co:Writer and Write:Outloud to help J. with writing assignments, as well as Kurzweil to assist J. in reading.  This recommendation was generally noted in J.'s 4/05 IEP.  But there is no mention of specific products that will be used, or the manner in which AT will be incorporated into J.'s instruction.  Indeed, Ms. Gordon testified that while she did allow J. to play phonics games on the computer, she did not utilize the writing software more than a few times.

The District updated J.'s evaluation in the fall of 2006.  The evaluator again concluded that assistive technology would benefit J. in his deficit areas, and specifically recommended decoding

software, as well as software to assist J. in his written expression. In December 2006, the school received a variety of AT tools to use with J. including, Kurzweil, Co:Writer, Write:Outloud, and Lexia. Ms. Smith testified that she participated in several training sessions to learn how to best use these tools with J. and other students. Curiously, however, J.'s subsequent IEP written in March, 2007 indicates that AT is *not* required for the student to access the curriculum. Nevertheless, Smith testified that J. gets regular computer time and can use the AT products. Smith's testimony indicated, however, that J. generally works independently and is free to choose the program he wants to use. Smith noted that J. likes some of the phonics and decoding programs, and she will sit with J. when he is working on the Lexia program. J., however, does not regularly use Co:Writer or Write:Outloud to help him with written expression, and Smith does not rely on those resources to enhance her writing lessons with J.

This evidence demonstrates that CPS failed to adequately implement the AT evaluator's recommendations from the start of the relevant period -- November 1, 2005 -- until December, 2006 when CPS installed AT and trained Ms. Smith. Even then, the record indicates that J. did not receive adequate guidance and supervision in making appropriate use of these products. Ms. Smith testified that for the most part, J. is allowed to choose what he wants to do on the computer, and he works independently. Indeed, with respect to written expression, CPS still has not provided J. with regular opportunities (with instructional supervision) to use this software. As Dr. Marsden-Johnson makes clear, such software is a critical tool to enabling J. to become more independent and adept at expressing himself and completing written assignments. Indeed, Co:Writer and Write:Outloud will promote J.'s learning and motivation by allowing J. to produce a superior work product with greater ease.

- **Adequacy of OT Services and Social Work Services**

Though the Student asserts CPS' OT services were inadequate, the evidence does not support this conclusion. Testimony from CPS occupational therapists and the Parent's own expert indicate that J. made steady progress in meeting the OT goals on his IEP. While Ms. Block would provide additional time of direct service to work on spacing issues, CPS has demonstrated its OT services for J. have satisfied the requirements of FAPE. There is no basis to conclude that providing OT services on a consultative basis will result in a denial of FAPE.[22]

Finally, the Parent asserts that social work services for J. have been inadequate. As indicated above, she has failed to meet her burden of proof on this issue.

### 3.   Whether the District Failed to utilize effective teaching methodologies at a sufficiently intensive level to enable the student to make progress commensurate with his cognitive skills

---

[22] There was much discussion from each of the occupational therapists about J.'s need to wear glasses, and his resistance to doing so. The Parent suggests that CPS should be held accountable for not ensuring that J. consistently wears his glasses. While it certainly would be advisable for the Parent and the District to collaborate on some type of incentive system to help motivate J. to wear his glasses, the decision ultimately is up to him.

The Parent next asserts that the District failed to utilize effective teaching methodologies at a sufficiently intensive level to enable the Student to make adequate progress. It is difficult to analyze this assertion because it is stated in such vague terms. Presumably, it is intended to refer to J.'s reading instruction.[23] While I disagree with the Student's contention that the District failed to use effective teaching methodologies to teach reading, I agree that reading instruction in the resource room should have been more intensive.

First, in considering whether CPS used effective methodologies to teach reading to J., all of the witnesses who testified about reading agreed that a multisensory approach is the most effective means of teaching J. to read. (*See, e.g.,* Testimony of Theus, Vandermar, Condron) The record confirms that both Ms. Gordon and Ms. Smith used multisensory approaches. Gordon testified that she relied on aspects of the Lindamood Bell method-- the method recommended in the UIC report -- to teach decoding. She also utilized clay and blocks to incorporate the tactile modality. Ms. Gordon also had the students act out the stories they had read as a means of incorporating a kinesthetic element to reading comprehension. Ms. Smith testified that she initially used a multi-sensory method called intensive phonics to teach phonics. More recently, she has begun using the Wilson method to teach reading to J. Wilson also relies on a multisensory approach to reading instruction.

With respect to the level of intensity, the Parent suggests that Ms. Gordon's reliance on several types of reading strategies may have detracted from the intensity of her reading instruction. The Parent's proof failed to support that conclusion, however, particularly in light of the fact that J. received over two hours a day of reading instruction as required by his IEP. Moreover, prior to the filing of her due process complaint, Ms. M. stated more than once that she believed Gordon's reading instruction was effective and that J. was making progress.

When J.'s special education placement was changed to a resource room, his instructional time was significantly decreased from 1200 to 400 minutes. (The other thirty minutes included on the IEP's was for speech and language therapy.) Such a reduction made it impossible for CPS to provide reading instruction with the intensity that J. required. Indeed, that J.'s IEP does not provide him with sufficient instructional time was confirmed by Ms. Smith who testified that she often sees J. for more time than his IEP specifies. While Ms. Smith's commitment is commendable, her actions do not relieve CPS of its a duty to provide J. with an IEP that appropriately addresses his instructional needs.

CPS' failure to provide reading instruction with an adequate level of intensity is further evidenced by the fact that J.'s achievement scores in reading have remained significantly below grade level. When measured near the end of his third grade year, for example, KTEA scores indicated that J.'s reading was on a mid first grade level, with a gain of only a few months from

---

[23] I make this assumption because there was no evidence presented at the hearing concerning the adequacy of J.'s math instruction. And while the Parent raised concerns about J.'s access to the science and social studies curriculum, there was little, if any, challenge to the sufficiency of the methodology for teaching these subjects.

the year before.  Since then, Ms. Smith has not attempted to objectively measure J.'s progress in reading.  According to the WIAT, which the UIC examiner administered at the beginning of this school year, J.'s reading skills have continued to remain significantly below grade level in decoding and in word recognition.   Indeed, the gap seems to have grown wider.

Finally, while it is true that J. functions within the low average range of intellectual ability, that does not mean he can't make better progress learning to read.  Star Academy reports confirm that J. made noticeable progress in a relatively short period of time when instructors used the Wilson method in intensive instructional sessions.  Within the last few months, CPS has begun providing Wilson instruction to J. in his resource room.  This is a promising development, which should continue at a level of intensity that will enable J. to make adequate progress.

### 4.  Whether CPS failed to offer a complete curricula in areas of reading, language arts, math, social studies and science, with the result that J. did not make academic progress

The Parent next argues that CPS failed to offer J. a complete curricula in the areas of reading, language arts, math, social studies and science, which prohibited him from making academic progress.  This assertion is overwhelmingly contradicted by the evidence, which indicates that J.'s teachers have worked hard to ensure that to the extent possible, J. is exposed to the same curricula and concepts  to which his peers are exposed.  For example, while J. was a member of Ms. Gordon's self-contained class, she recognized that he was unable to read the science and social studies texts used in the regular classroom.  Thus, Ms. Gordon taught J. using materials that discussed the same topics, but were on a lower reading level.  In addition, J.'s fourth and fifth grade regular classroom teachers both testified that J. participates in the same lessons as his peers, and is expected to complete homework and assignments to the extent he is able.  Indeed, Ms. Smith's testimony about her collaboration with the regular classroom teachers, and her efforts to help J. with his regular classroom assignments was noteworthy.[24]

### 5.  Whether numerous deficiencies in J.'s IEP denied him FAPE

Finally, the Parent presents a number of alleged deficiencies in J.'s IEP's -- both procedural and substantive -- that she contends resulted in a denial of FAPE.  Many of these allegations, particularly those that deal with related services, are repetitive of issues raised above and already have been addressed.  The remaining issues are discussed below.

First, as noted above, *Board of Educ. v. Rowley,* 458 U.S. 176, 188-89 (1982) sets forth a two pronged test to determine whether a school district has offered a student FAPE.   The first

---

[24] A note of caution, here.  As J. progresses to the intermediate grades, content will become more difficult to read and complex to understand.  That is why it is imperative that CPS strike the right balance between providing J. with intensive remediation for reading and writing, and creating accommodations and modifications for his classroom work.  (Indeed, Carol Condron testified that striking the right balance is one of the hardest challenges that special education teachers face.)  Otherwise, J. may reach the point where the gap between his ability and the demands of the curriculum is too great to overcome, and modifications and accommodations become so extensive that there is no meaningful requirement for the Student to learn and succeed in a regular classroom.

inquiry to be made is whether the school district has complied with the statutory procedures required by IDEA. (20 U.S.C. 1401 et seq.) Parents are entitled to relief for procedural violations only if the alleged violations resulted in substantial harm to the student. *W.G. v Board of Trustees, 960 F.2d 1479, 1484 (9ᵗʰ Cir. 1992)* The second prong of the *Rowley* test concerns substantive denials of FAPE. That prong of the test is explained in detail above, and will not be repeated here.

There are a number of IEP's (including revisions) that were implemented during the relevant time period. While there are slight omissions and small mistakes in several of them, the March 29, 2007 IEP contained deficiencies that are serious enough to constitute a denial of FAPE.[25] Specifically, the IEP goal for Language Arts, English and Reading is substantially deficient. It fails to provide a measurable level of performance. Instead, it vaguely mentions that J. is "performing below his current grade level." Such an indistinct statement offers no baseline with which to determine whether J. has made progress. Neither is the "measurable" annual goal measurable. It simply states that a variety of strategies (without specifying which) will be used to teach fluency and word attack concepts. Finally, the quarterly benchmarks are unclear and confusing to the point where it is impossible to discern what skills the student will gain if the benchmark is mastered. Moreover, two of the benchmarks do not specify the level of mastery required to successfully meet the benchmark. In other words, *all* of the elements of that IEP goal are deficient. Such procedural failures are so substantial that they constitute a denial of FAPE.[26]

The Parent also contends that J. was denied FAPE, because the school did not allow him to participate in the extended school year program despite "substantial evidence that the student has experienced total lack of educational progress over the past two years." To suggest that J. experienced a total lack of progress is a gross overstatement. It ignores evidence that demonstrates that J. was making progress in a number of areas and receiving passing grades in his classes. I agree, however, that because of his serious deficiencies in reading, esy should have been offered to J. for the summer of 2006 and 2007. By failing to allow him to participate in esy, the District denied J. FAPE.

**Pursuant to the above findings of fact and conclusions of law, it is hereby ordered:**

1. The Parent's request that the Student be allowed to attend a private therapeutic day school at public expense is denied.

---

[25] The 4/6/06 IEP also denied J. FAPE by failing to provide adequate instructional time to meet J.'s needs. Since I have already addressed that issue, I do not repeat it here.

[26] I am also concerned that recent IEP's, written after the parent requested a due process hearing, are not complete, but have several sections where the drafter has written "NA". When questioned about the reason for this notation, Ms. Smith testified that those portions could not be completed until the outcome of the hearing. Neither did the Parent object to the District's failure to complete those sections. I do not conclude, therefore, that these omissions constitute a denial of FAPE, but rely on the Parties' representations that an IEP conference is to be convened immediately after my decision is rendered, and the omissions will be filled in.

2.  The Parent's request that CPS pay for independent educational evaluations that were completed in the areas of occupational therapy, social/emotional, speech and language and assistive technology is denied.

3.  The Parent's request that CPS be directed to pay for additional independent evaluations in areas of demonstrated need such as OT, is denied.

4.  Parent's request that CPS be directed to provide related services with sufficient intensity is granted with respect to speech and language and assistive technology.  The District is ordered to provide J. with at least one hour per week of speech and language therapy extending, at least, through the 2008-09 school year.  The District is also ordered to provide J. with appropriate assistive technology support.  This requires more than insuring AT products are available in the resource room.  CPS must provide both the resource room teacher and the Student with adequate training to be able to use the AT products.  Most important, the Student must receive weekly instruction -- with direct teacher supervision --using one or more of the AT products for written expression. (Co:Writer and Write:Outloud)    Instructional time for written expression must be at least forty minutes per week.  To the extent it has not already happened, J. should begin to use the written expression software to assist him in completing written assignments from his regular classroom assignments.

5.  Parent's request that CPS be directed to provide the Student with compensatory services is granted in the following ways:

- CPS shall provide the Student with after school tutoring by a certified special education teacher for one hour per week for the 2008-09 school year;

- CPS shall provide the Student with reading instruction in the summer of 2008 and 2009.  Because it has proved to be more successful with J. than other multisensory methods, the instruction must rely on the Wilson method.  Moreover, instruction must be provided by a teacher who has received Wilson training, and who has taught the Wilson method to students. The summer sessions must extend for at least five weeks, with at least three sessions per week lasting two or more hours.

6.  The Parties shall convene an IEP conference no later than two weeks from the date of this decision to draft a new IEP for J., which takes this decision and order into account.  In particular, the IEP must provide sufficient time for J. to receive at least one hour a day, at least four days a week, of reading instruction using the Wilson reading method.[27]

---

[27] To ensure J.'s progress, the instructor should closely follow the Wilson manual of instructions, and avoid combining elements of numerous methods.  This will more effectively provide the consistency, repetition and reinforcement that is critical to J.'s success.

7.  Assuming Ms. Smith will be the individual who provides Wilson instruction to the Student, CPS shall provide Ms. Smith with additional training in the Wilson method, either through additional support from Ms. Condron, or by providing for Ms. Smith to attend at least one additional Wilson seminar at CPS' expense.

8.  The District shall provide proof of compliance with the aforesaid orders to the Illinois State Board of Education, Compliance Division, 100 no. First St., Springfield, Il. 62777-001, on or before June 15, 2008.

DATED:  May 12, 2008

_____
Kristine L. Anderson
Impartial Hearing Officer
P.O. Box 7065
Evanston, Il. 60204

## MAUK & O'CONNOR, LLP
1427 WEST HOWARD STREET
CHICAGO, ILLINOIS 60626-1426

MICHAEL A. O'CONNOR
(773) 262-2199 tel
(773) 338-8397 fax
Mikeoc@earthlink.net

SARA E. MAUK
(773) 262-2377 tel
(773) 338-8397 fax
semauk@earthlink.net

### VIA EMAIL AND U.S. MAIL

June 11, 2008

Kathleen Gibbons, Esq.
Senior Assistant Attorney
Chicago Public Schools
125 South Clark Street, 7th Floor
Chicago, IL. 60603

RE:    **John Matthews, ISBE Case No. 2007-0212**

Dear Ms. Gibbons:

As you may be aware the above named student and his parent obtained substantial relief following their request for a due process hearing. Following a five day hearing, the hearing officer found that CPS had denied the student a free and appropriate public education for more than two years. The Hearing Officer ordered extensive remedial relief including at least one hour per week of speech/language therapy for the 2008-9 school year; additional training for the special education teacher in Wilson Reading System (WRS); direct instruction in written expression, using assistive technology software for at least 40 minutes per week; training in assistive technology for both the student and his special education teacher. The Hearing Officer ordered WRS instruction for the student at least one hour per day, four days per week during the regular school year. The Hearing Officer also ordered compensatory services consisting of direct instruction using WRS for two hours per day, three days per week for five weeks over the summer of 2008 and 2009; after school tutoring 1 hour per week for the 2008-9 school year.

Because the parent was the prevailing party in the due process proceeding, I am now submitting parent's claim for attorney fees and costs. Federal law provides that guardians or guardians who prevail as parties in a special education dispute are entitled to recover their attorney's fees. Individuals with Disabilities Education Act, 20 U.S.C. 1415(i)(3). Case law indicates that courts generally award attorneys' fees where guardians have prevailed by achieving a material alteration of the legal relationship of the parties. Jacqueline's guardian has obtained the relief she sought. *C.M. v. Chicago Public Schools District 299 Board of Education,* 00 C 2446 (N.D. Ill. 2/5/01); *O.B.Jr. v Chicago Public Schools District 299 Board of Education,* 00 C 1315 (N.D. Ill. 3/30/01); *Jessica P. v Chicago Public Schools, District 299 Board of Education,* 05 C 0005 (November 30, 2005); *Jessica P. v Chicago Public Schools, District 299 Board of Education, 06 C 0002 (April 13, 2006); Jason A. v. Chicago Public Schools, District*



Kathleen Gibbons
Re: John Matthews
June 11, 2008
Page 2 of 2

*299 Board of Education,* 06 C 0142 (June 1, 2006); *Buckhannon Board & Care Home, Inc. v. West Virginia Dept. of Health & Human Resource,* 121 S.Ct. 1835 (2001).

As the prevailing party, we hereby request that the district forward to us payment for the fees, which have been incurred to date. Our fees are as follows:

| | | |
|---|---|---|
| Michael O'Connor's time: 144.65 hours @ $350/hr | = | $50,627.50 |
| Peter Godina's time  13.75  hours@$95/hr | = | $ 1,306.75 |
| Expenses incurred on behalf of John Matthews | = | $  880.27 |

| | | |
|---|---|---|
| **Total Fees and Costs :** | | **$52,814.02** |

For your convenience, we have enclosed a detailed billing indicating how the above time was spent in litigating this case. We require confirmation of your intention to pay our fees by June 25, 2008. Further, we will require actual payment of these fees within 45 days.

We will pursue this demand for fees as needed in order to recoup the above amount. In the event that we are forced to litigate these issues, any fees incurred by us in litigation will also be reimbursable. It is my hope that we can avoid protracted litigation with respect to this matter. Please note that a complaint is pending with the Illinois State Board of Education regarding noncompliance with the due process decision; if the complaint is not resolved promptly, a supplemental fee claim may be forthcoming.

I look forward to hearing from you within the next 14 days. Please do not hesitate to contact me for any questions regarding the above matter.

Sincerely Yours,

Michael A. O'Connor

Enc.
Cc:    Lisa Matthews

MAUK & O'CONNOR, LLP
1427 W. HOWARD
CHICAGO, IL. 60626

Lisa Matthews
9722 S. Morgan
Chicago, IL 60643


In reference to:                    JOHN MATTHEWS,  SPECIAL EDUCATION
                                    OUR FILE NUMBER 07-127-01
                                    ISBE No. 2008-212

## PROFESSIONAL SERVICES;

| | | | |
|---|---|---|---|
| 7/21/07 | MO'C | PHONE INQUIRY FROM PARENT RE SCHOOL PROBLEMS, QUERY ABOUT POTENTIAL REPRES- ENTATION | 0.50 |
| 7/25/07 | | MO'C  REVIEW SCHOOL RECORDS SENT BY PARENT | 1.25 |
| 7/27/07 | MO'C | INTAKE INTERVIEW OF PARENT AND STUDENT; REVIEW ADDITIONAL SCHOOL RECORDS | 2.50 |
| 8/8/07 | PG | ORGANIZE FILE – PARENT DOCUMENTS | 0.75 |
| 8/14/07 | MO'C | DRAFT LETTER TO UIC FAMILY CLINIC RE PENDING IEE | 0.25 |
| | | MO'C  DRAFT LETTER REQUESTING SCHOOL RECORDS FROM CPS | 0.25 |
| 8/24/08 | MO'C | PHONE CALL UIC FAMILY CLINIC RE AMENDED RELEASE REQUIRED FOR RECORDS | 0.25 |
| | | MO'C  DRAFT LETTER TO CLIENT RE SIGNATURE FOR AMENDED RELEASE AND ADDITIONAL INQUIRIES RE SCHOOL RECORDS | 0.25 |
| 10/30/07 | MO'C | DRAFT DUE PRCESS REQUEST LETTER | 1.75 |
| 11/1/07 | MO'C | EDIT AND REVISE DUE PROCESS REQUEST LETTER | 0.50 |
| 11/12/07 | MO'C | REVIEW ADDITIONAL SCHOOL RECORDS FROM PARENT | 0.50 |
| | | MO'C  DRAFT LETTER TO CLIENT RETURNING SCHOOL RECORDS | 0.10 |
| 11/16/07 | MO'C | REVIEW CPS RESPONSE TO DUE PROCESS COMPLAINT | 0.30 |

|          |      |                                                                                            |      |
|----------|------|--------------------------------------------------------------------------------------------|------|
|          | MO'C | PHONE CALL TO CLIENT TO DISCUSS OPTIONS FOR RESPONDING                                      | 0.50 |
| 11/17/07 | MO'C | EMAIL EXCHANGE WITH CLIENT RE ISSUES IN DUE PROCESS                                         | 0.25 |
|          | MO'C | DRAFT LETTER TO ST. XAVIER LEARNING CENTER RE RECORDS OF TUTORING FOR STUDENT               | 0.25 |
| 11/6/07  | MO'C | PHONE CALL TO MS. TOMLINSON AT UIC FAMILY CLINIC RE STATUS OF IEE REPORT                    | 0.25 |
|          | PG   | ORGANIZE FILE; CATALOGUE DOCUMENTS PROVIDED BY PARENT                                       | 3.00 |
| 11/26/07 | MO'C | PHONE CALL FROM KATIE CONWAY, Ph.D. AT XAVIER UNIVERSITY; REVIEW STUDENT STATUS; PENDING ISSUES | 0.50 |
| 12/4/07  | MO'C | EMAIL EXCHANGE WITH IHO AND CPS COUNSEL RE SETTING DATE FOR STATUS CONFERENCE               | 0.25 |
|          | MO'C | EMAIL EXCHANGE WITH IHO AND CPS COUNSEL TO SET STATUS CONFERENCE DATE                       | 0.10 |
| 12/12/07 | MO'C | EMAIL EXCHANGE WITH IHO AND CPS COUNSEL TO SET TIME OF DAY FOR STATUS CONFERENCE DATE       | 0.10 |
| 12/26/07 | MO'C | EMAIL EXCHANGES WITH CLIENT, DR.JOHNSON AND MARY RE-SCHEDULING IEE'S BECAUSE OF INCLEMENT WEATHER | 0.25 |
| 12/27/07 | MO'C | COMPILE DOCUMENTS RELEVANT TO IEE BY SPEECH PATHOLOGIST; FORWARD TO DR MARSDEN-JOHNSON      | 0.50 |
| 1/6/08   | MO'C | PHONE CALL FROM PARENT RE ST. XAVIER REPORT; IEP, NEXT STEPS                                | 0.50 |
| 1/8/08   | MO'C | EMAIL EXCHANGE WITH PARENT RE QUESTIONS ABOUT 12/20/07 IEP; ISSUES FOR UPCOMING IEP MEETING | 0.50 |
| 1/9/08   | MO'C | PHONE CALL FROM CPS COUNSEL RE XAVIER REPORT                                                | 0.10 |
| 1/11/08  | MO'C | PHONE CALL FROM CLIENT RE STATUS OF SPEECH IEE                                              | 0.25 |
|          | MO'C | CONFERENCE CALL WITH IHO AND CPS COUNSEL RE HEARING SCHEDULE                                | 0.30 |

| | | | |
|---|---|---|---|
| | MO'C | EMAILS TO PARENT AND WITNESSES RE HEARING SCHEDULE | 0.25 |
| 1/15/08 | MO'C | REVIEW PREHEARING CONFERENCE NOTICE FROM IHO | 0.35 |
| 1/20/08 | MO'C | REVIEW DOCUMENTS; EDIT DOCUMENT LIST FOR PRE-HEARING CONFERENCE | 1.25 |
| | MO'C | COMPILE WITNESS LIST FOR PREHEARING CONFERENCE | 0.75 |
| 1/22/08 | MO'C | REVIEW AND EDIT DOCUMENT LIST AND WITNESS LIST | 0.50 |
| | MO'C | DRAFT PREHEARING PARENT STATEMENT | 0.50 |
| 1/23/08 | MO'C | REVIEW CPS DOCUMENT LIST AND WITNESS LIST | 0.25 |
| | MO'C | PREHEARING CONFERENCE WITH IHO AND CPS COUNSEL | 1.25 |
| 1/24/08 | MO'C | REVIEW IHO DRAFT PREHEARING CONFERENCE REPORT; FORWARD COMMENTS FOR TECHNICAL CORRECTIONS | 0.50 |
| 1/24/08 | MO'C | PHONE CALL TO SUPERVISOR AT LARABIDA HOSP RE INTERVIEW OF THOMPSON, SPEECH PATHOLOGIST | 0.25 |
| | MO'C | PHONE CALL TO DR. BAKER AT STAR LEARNING CENTER STUDENT PROGRESS, STUDENT SERVICES; POSSIBLE TESTIMONY AT DUE PROCESS HEARING | 0.30 |
| 1/25/08 | MO'C | PHONE CALL TO THOMPSON, SPEECH PATHOLOGIST AT LARABIDA HOSP RE SERVICES TO STUDENT | 0.30 |
| | MO'C | DRAFT SUBPOENAS FOR PARENT WITNESSES: DR. THEUS; DR. CONWAY; MS. THOMPSON; CPS HUMAN RESOURCE DIRECTOR – FORWARD TO IHO FOR SIGNATURE | 0.50 |
| 1/28/08 | MO'C | REVIEW SIGNED SUBPOENAS FROM IHO; FORWARD TO RESPECTIVE WITNESSES | 0.50 |
| 1/26/08 | MO'C | DRAFT DISSENT TO 12/20/07 IEP | 2.25 |
| | MO'C | FORWARD DRAFT DISSENT TO CLIENT; PHONE CALL TO DISCUSS | 0.50 |
| 1/27/08 | MO'C | REVISE AND EDIT PARENT DISSENT TO 12/20/08 IEP | 0.50 |

| | | | |
|---|---|---|---|
| 1/29/08 | MO'C | DRAFT COVER LETTER TO CPS COUNSEL TRANSMITTING DISSENT; REVIEW AND EDIT DISSENT | 0.25 |
| 2/4/08 | MO'C | PHONE CALL FROM MARY BLOCK; FORWARD COPIES OF IEP'S AND OTHER DOCUMENTS TO HER FOR IEE | 0.25 |
| 2/10/08 | MO'C | REVIEW SAMPLES OF STUDENT HOMEWORK SENT BY PARENT; SELECT SAMPLES FOR PARENT DOCUMENT BOOK | 0.50 |
| 2/11/08 | MO'C | REVIEW SPEECH/LANGUAGE AND ASSISTIVE TECHNOLOGY REPORT FROM DR. MARSDEN-JOHNSON | 0.50 |
| | MO'C | FORWARD TO CLIENT; PHONE TO REVIEW AND DISCUSS FINDINGS | 0.35 |
| 2/12/08 | MO'C | REVIEW LETTER FROM UIC COUNSEL OBJECTING TO SUBPOENA OF DR. THEUS | 0.25 |
| | MO'C | PHONE CALL WITH UIC COUNSEL RE OBJECTIONS TO DR. THEUS SUBPOENA | 0.25 |
| | MO'C | REVIEW MENTAL HEALTH CONFIDENTIALITY CODE; DRAFT LETTER CONCERNING UIC COUNSEL OBJECTIONS | 1.25 |
| 2/13/08 | PG | ORGANIZE FILE; COMPILE AND CATALOGUE CPS DOCUMENTS | 4.50 |
| | MO'C | DRAFT LETTER TO CPS COUNSEL TRANSMITTING SPEECH IEE REPORT | 0.25 |
| 2/14/08 | MO'C | DRAFT AMENDED RELEASE ALLOWING TESTIMONY BY DR THEUS FROM UIC FAMILY CLINIC; FORWARD TO CLIENT | 0.25 |
| | MO'C | EMAIL MESSAGES TO/FROM UIC COUNSEL'S OFFICE RE CONDITIONS FOR TESTIMONY BY DR. THEUS | 0.30 |
| | MO'C | REVIEW LOGS PREPARED BY PARENT RE STUDENT REPORTS OF ACITIVITIES | 0.50 |
| | MO'C | PHONE CALL TO UIC COUNSEL; OBJECTIONS TO SUBPOENA RESOLVED | 0.25 |
| | PG | ORGANIZE FILE; COMPILE AND CATALOGUE CPS DOCUMENTS; PREPARE HEARING BOOK | 3.00 |

JOHN MATTHEWS/FEE PETITION
6/11/08
Page 5 of 10

| | | | |
|---|---|---|---|
| 2/15/08 | PG | ORGANIZE FILE; COMPILE AND CATALOGUE CPS DOCUMENTS; PREPARE HEARING BOOK | 2.50 |
| 2/19/08 | MO'C | PHONE CALL TO DR. THEUS RE TESTIMONY; ASK FOR LETTER REGARDING REQUEST TO TESTIFY BY PHONE | 0.25 |
| | MO'C | REVIEW LETTER FROM DR. THEUS REQUESTING TO TESTIFY BY PHONE; FORWAD TO IHO AND CPS COUNSEL | 0.25 |
| 2/15/08 | MO'C | RESEARCH AND COMPILE INFORMATION FOR PARENT DOCUMENT BOOK ON WILSON READING SYSTEM | 1.25 |
| | MO'C | DRAFT COVER LETTER TO CPS COUNSEL TRANSMITTING OCCUPATIONAL THERAPY REPORT BY MARY BLOCK | 0.25 |
| | MO'C | REVIEW LETTER FROM CPS OFFERING SETTLEMENT | 0.25 |
| | MO'C | PHONE CALL TO PARENT TO DISCUSS OPTIONS FOR RESPONDING | 0.50 |
| 2/17/08 | MO'C | REVIEW AND EDIT PARENT DOCUMENT BOOK | 1.50 |
| | MO'C | EDIT FINAL PARENT WITNESS LIST | 0.50 |
| 2/19/08 | MO'C | COMPILE EXTRACTS FOR HEARING DOCUMENT BOOK FOR TESTIMONY OF DR. CONWAY | 0.75 |
| | MO'C | DRAFT COVER LETTER TRANSMITTING DOCUMENTS TO DR. CONWAY | 0.50 |
| | MO'C | COMPILE EXTRACTS FOR HEARING DOCUMENT BOOK FOR TESTIMONY OF DR. MARSDEN-JOHNSON | 0.75 |
| | MO'C | DRAFT COVER LETTER TRANSMITTING DOCUMENTS TO DR. MARSDEN-JOHNSON | 0.50 |
| | MO'C | COMPILE EXTRACTS FOR HEARING DOCUMENT BOOK FOR TESTIMONY OF DR. THEUS | 0.75 |
| | MO'C | DRAFT COVER LETTER TRANSMITTING DOCUMENTS TO DR. THEUS | 0.50 |
| | MO'C | COMPILE EXTRACTS FOR HEARING DOCUMENT BOOK FOR TESTIMONY OF MARY BLOCK | 0.75 |

| | | | |
|---|---|---|---|
| | MO'C | DRAFT COVER LETTER TRANSMITTING DOCUMENTS TO MARY BLOCK | 0.50 |
| 2/20/08 | MO'C | PREPARE OUTLINE OF TESTIMONY PROJECTED FOR DR. THEUS, LINKED TO PARENT DOCUMENTS | 1.75 |
| | MO'C | REVIEW LETTER FROM IHO DENYING DR. THEUS' REQUEST TO TESTIFY BY PHONE; FORWARD TO DR. THEUS | 0.35 |
| 2/21/08 | MO'C | TRAVEL TO WACKER SCHOOL FROM OFFICE | 1.00 |
| | MO'C | ATTEND IEP MEETING | 3.25 |
| | MO'C | CONFER WITH CLIENT FOLLOWING IEP MEETING | 0.50 |
| | MO'C | TRAVEL FROM WACKER SCHOOL TO OFFICE | 1.25 |
| | MO'C | EMAIL EXCHANGE RE SCHEDULING TESTIMONY AND SCHEDULING TIME TO DISCUSS TESTIMONY, DR. THEUS | 0.15 |
| 2/22/08 | MO'C | PREPARE OUTLINE OF TESTIMONY PROJECTED FOR DR. MARSDEN-JOHNSON, LINKED TO PARENT DOCUMENTS | 1.50 |
| | MO'C | PREPARE OUTLINE OF TESTIMONY PROJECTED FOR MARY BLOCK, LINKED TO PARENT DOCUMENTS | 1.75 |
| | MO'C | PREPARE OUTLINE OF TESTIMONY PROJECTED FOR DR. CONWAY, LINKED TO PARENT DOCUMENTS | 1.75 |
| | MO'C | DRAFT LETTER TO CPS COUNSEL REJECTING SETTLEMENT OFFER | 0.35 |
| | MO'C | PHONE CONFERENC W/DR THEUS RE TESTIMONY | 1.00 |
| 2/23/08 | MO'C | PHONE INTERVIEW WITH DR JOHNSON TO REVIEW TESTIMONY | 1.25 |
| | MO'C | PHONE INTERVIEW WITH MARY BLOCK TO REVIEW HER TESTIMONY | 1.50 |
| 2/24/08 | MO'C | EMAILS TO/FROM MARY BLOCK RE QUESTIONS ABOUT HER IEE REPORT | 0.30 |
| | MO'C | PREPARE OUTLINE FOR EXAMINATION OF CASEMANAGER | 0.75 |

|  |  |  |  |
|---|---|---|---|
|  |  | FOR 2006-7 SCHOOL YEAR |  |
|  | MO'C | PREPARE OUTLINE FOR EXAMINATION OF CPS SPEECH PATHOLOGISTS (THREE INDIVIDUALS) | 1.50 |
|  | MO'C | PREPARE OUTLINE FOR EXAMINATION OF CPS SPED TEACHER FOR 2006-7 SCHOOL YEAR | 0.50 |
|  | MO'C | PHONE INTERVIEW WITH MARY BLOCK TO REVIEW HER TESTIMONY | 1.50 |
|  | MO'C | PREPARE OUTLINE FOR EXAMINATION OF CPS REGULAR ED TEACHER FOR THE 2006-7 SCHOOL YEAR | 0.50 |
|  | MO'C | PREPARE OUTLINE FOR EXAMINATION OF SCHOOL PSYCHOLOGIST FOR 2006 3-YR EVAL | 0.75 |
| 2/25/08 | MO'C | TRAVEL FROM OFFICE TO WACKER SCHOOL | 1.00 |
|  | MO'C | ATTEND DUE PROCESS HEARING – DAY ONE | 7.25 |
|  | MO'C | TRAVEL FROM WACKER SCHOOL TO OFFICE | 1.25 |
|  | MO'C | DRAFT LETTER REQUESTING TRANSCRIPT OF DUE PROCESS HEARING | 0.25 |
|  | MO'C | COMPILE EXTRACTS FOR HEARING DOCUMENT BOOK FOR TESTIMONY OF FAITH VANDARMAR | 0.75 |
|  | MO'C | DRAFT COVER LETTER TRANSMITTING DOCUMENTS TO FAITH VANDARMAR | 0.50 |
|  | MO'C | DRAFT SUBPOENA FOR AFRICA ANDERSON | 0.15 |
|  | MO'C | EMAILS TO/FROM DR CONWAY RE INTERPRETATION OF WISC-IV AND KTEA-II SCORES BY CPS | 0.25 |
|  | MO'C | PHONE CALL TO DR. CONWAY RE TESTIMONY | 0.50 |
| 2/26/08 | MO'C | TRAVEL FROM OFFICE TO WACKER SCHOOL | 1.00 |
|  | MO'C | ATTEND DUE PROCESS HEARING – DAY TWO | 7.50 |
|  | MO'C | TRAVEL FROM WACKER SCHOOL TO OFFICE | 1.25 |

JOHN MATTHEWS/FEE PETITION
6/11/08
Page 8 of 10

| Date | | Description | Hours |
|------|------|-------------|-------|
| 2/27/08 | MO'C | REVIEW SIGNED SUBPOENA; FORWARD TO WITNESS | 0.15 |
| 3/2/08 | MO'C | INPERSON INTERVIEW OF PARENT AND STUDENT TO REVIEW TESTIMONY AND DISCUSS HEARING STATUS | 2.50 |
| 3/4/08 | MO'C | PHONE CALL TO AFRICA ANDERSON REGARDING SCHEDULING TESTIMONY | 0.25 |
| | MO'C | PHONE CALL WITH CPS COUNSEL RE WITNESS SCHEDULES FOR THE HEARING | 0.25 |
| | MO'C | COMPILE RELEVANT DOCUMENTS FOR TESTIMONY BY AFRICA ANDERSON AND FORWARD TO HER VIA EMAIL | 0.30 |
| 3/5/08 | MO'C | TRAVEL FROM OFFICE TO CPS CLUSTEROFFICE, 6533 S. STEWART | 1.00 |
| | MO'C | ATTEND DUE PROCESS HEARING – DAY THREE | 7.25 |
| | MO'C | TRAVEL FROM WACKER SCHOOL TO OFFICE (HEARING TRANSFERRED TO WACKER SCHOOL AFTER LUNCH) | 1.25 |
| | MO'C | EMAIL TO DR THEUS REGARDING TESTIMONY FROM CPS STAFF AND QUERIES ABOUT INTERPRETATION; ALSO INQUIRE ABOUT RECALLING AS REBUTTAL WITNESS | 0.50 |
| 3/6/08 | MO'C | EMAIL EXCHANGE WITH DR. CONWAY RE INTERPRETATION OF KTEA-II AND WISC-II SCORES | 0.25 |
| 3/4/08 | MO'C | REVIEW HEARING WITNESS SCHEDULE FROM CPS COUNSEL FOLLOW UP PHONE CALL TO DISCUSS ADJUSTMENTS | 0.25 |
| 3/10/08 | MO'C | PREPARE OUTLINE FOR TESTIMONY BY MS. SMITH, CURRENT CASE MANAGER | 1.50 |
| | MO'C | PREPARE OUTLINE FOR CLOSING STATEMENT | 1.50 |
| | MO'C | PHONE CALL TO PARENT REGARDING HEARING STATUS AND REVIEW OF POSSIBLE TESTIMONY | 0.75 |
| 3/11/08 | MO'C MO'C | TRAVEL FROM OFFICE TO WACKER SCHOOL | 1.00 |
| | MO'C | ATTEND DUE PROCESS HEARING – DAY FOUR | 7.50 |

B-10

| | | | |
|---|---|---|---|
| | MO'C | TRAVEL FROM WACKER SCHOOL TO OFFICE | 1.25 |
| 3/31/08 | MO'C | EMAIL EXCHANGE WITH CLIENT RE STATUS OF STUDENT'S GLASSES; ADDITIONAL LOGS FROM SCHOOL | 0.15 |
| 4/17/08 | MO'C | EMAIL EXCHANGE RE FAILURE TO PROVIDE TRANSCRIPTS | 0.25 |
| | MO'C | REVIEW TRANSCRIPTS OF HEARING DAYS FOR FEBRUARY AND MARCH; LINK CRITICAL TESTIMONY TO HEARING DOCUMENTS | 3.50 |
| 4/24/08 | MO'C | EMAIL LOGISTICAL INFOR AND RESEARCH RE PHONICS BASED READING PROGRAMS TO F VANDARMAR | 0.15 |
| | MO'C | PHONE INTERVIEW OF F. VANDARMAR REGARDING EXPERT TESTIMONY ON WILSON READING SYSTEM | 0.75 |
| 4/25/08 | MO'C | INPERSON INTERVIEW OF STUDENT REGARDING TESTIMONY | 1.25 |
| 4/26/08 | MO'C | INPERSON INTERVIEW OF PARENT REGARDING TESTIMONY AND HEARING STATUS | 2.50 |
| 4/27/08 | MO'C | COMPILE AND REVIEW CASE LAW FOR USE IN CLOSING STATEMENT | 2.25 |
| | MO'C | PREPARE CLOSING STATEMENT | 1.50 |
| 4/28/08 | MO'C | TRAVEL FROM OFFICE TO WACKER SCHOOL | 1.00 |
| | MO'C | ATTEND DUE PROCESS HEARING – DAY FIVE | 7.00 |
| | MO'C | TRAVEL FROM WACKER SCHOOL TO OFFICE | 1.25 |
| 5/13/08 | MO'C | REVIEW 29 PAGE DUE PROCESS DECISION | 0.75 |
| | MO'C | PHONE CALL TO CLIENT TO DISCUSS DECISION | 0.50 |
| 5/19/08 | MO'C | TRAVEL FROM OFFICE TO WACKER SCHOOL | 1.00 |
| | MO'C | ATTEND IEP MEETING CONVENED AS RESULT OF DUE | 3.25 |
| | MO'C | CONFER WITH PARENT RE ISSUES FOR DISSENT | 0.25 |
| | MO'C | TRAVEL FROM WACKER SCHOOL TO OFFICE | 1.25 |

| 5/30/08 | MO'C | REVIEW 19 PAGE IEP EMAILED BY CPS COUNSEL | 0.50 |
|---|---|---|---|
| | MO'C | FORWARD TO CLIENT; DISCUSS ISSUES AND PENDING CONCERNS REGARDING ESY AND AT TRAINING ORDERED BY IHO | 0.50 |
| 6/4/08 | MO'C | PHONE CALL FROM CLIENT RE LACK OF INFO RE ESY AND AT TRAINING ORDERED BY IHO | 0.25 |
| 6/5/08 | MO'C | DRAFT LETTER TO ISBE RE COMPLAINT OF NON-COMPLIANCE WITH IHO ORDER | 0.50 |
| 6/8/08 | MO'C | DRAFT FEE PETITION & FEE DEMAND LETTER | 2.00 |
| 6/9/08 | MO'C | REVISIONS TO FEE PETITION & FEE DEMAND LETTER | 1.50 |

Michael O'Connor's time: 144.65 hours @ $350/hr     =     $ 50,627.50
Peter Godina's time: 13.75    hours @ $95/hr     =     $  1,306.25

**TOTAL FOR PROFESSIONAL SERVICES RENDERED**          **$ 51,933.75**


**ADDITIONAL COST AND CHARGES**

PHOTOCOPY/FAX EXPENSE – IN OFFICE          $  768.75
POSTAGE/FEDERAL EXPRESS          $  111.52


**TOTAL COST AND CHARGES**          **$  880.27**

**TOTAL AMOUNT OF THIS BILL:**          **$ 52,814.02**